PER CURIAM:
Jose Hernandez-Mandujano (“Hernandez”) was indicted for and pled guilty to unlawful re-entry[1] after two U.S. Border Patrol Agents stopped him as he was driving eastbound at Mile Marker 15 on Interstate 10 near Lake Charles, Louisiana. Hernandez argued before the district court that all evidence deriving from this stop should be suppressed because the agents lacked reasonable suspicion at the time of the stop. The district court disagreed and denied Hernandez’s motion to suppress. Although we conclude that the agents lacked reasonable suspicion, and clearly violated the Fourth Amendment in stopping Hernandez, we AFFIRM the judgment of the district court because “neither [Herandez’s] identity nor his INS file are [sic ] suppressible.” United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir.1999).
I.
On April 18, 2011, shortly after 10:00 a.m., U.S. Border Patrol Agents Brett Sullivan and Jeremy Taylor stopped Hernandez as he was driving eastbound on Interstate 10 near Lake Charles, Louisiana, approximately 450 miles from the nearest United States-Mexico border crossing. When Hernandez first drove past the agents, they noticed his hands were “locked” on the steering wheel of his white Ford Explorer SUV; his grip was tight and his arms were straight out, and he allegedly did not display the relaxed nature of most drivers. Because the agents believed Hernandez was exhibiting nervous behavior, they began to follow him. As they followed, they noticed Hernandez’s speed dropped from around 70 miles per hour (the posted speed limit) to about 60 miles per hour. Furthermore, when the agents were behind Hernandez, they noticed him talking to the person in the passenger’s seat, but when they pulled alongside Hernandez, the conversation ceased — only to resume again when the agents dropped back.
The agents additionally noticed the car had a Tinkerbell steering wheel cover and, upon checking the vehicle’s license plates, learned the car was registered to a woman, but was not reported stolen, had no out *348 standing warrants or criminal activity associated with it, and had not recently crossed the border. Nonetheless, after following Hernandez for approximately five miles, the agents felt convinced Hernandez was transporting illegal aliens and pulled him over. The agents then learned from their questions Hernandez’s name, that he is a Mexican national, and that he was present'in the United States illegally.
Thus, based on this stop, Hernandez was charged with one count of re-entry without permission by an alien deported after conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2). Hernandez filed a motion to suppress all evidence deriving from the war-rantless stop, arguing it did not comport with the definition of an “extended border search” and that the agents lacked reasonable suspicion under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). After holding an evidentiary hearing, the district court agreed the stop was not an extended border search, but denied Hernandez’s motion to suppress because it found the agents had a reasonable suspicion of illegal activity.
Hernandez then pled guilty, specifically preserving his right to appeal the district court’s ruling regarding the motion to suppress. He was sentenced to 33 months of imprisonment and three years of supervised release, and was ordered to pay a $100 special assessment. He timely appealed.
II.
In this appeal, we must address whether the agents violated the Fourth Amendment in stopping Hernandez, and, if so, whether we may grant Hernandez’s motion to suppress.
A.
The first question we consider is whether the agents had reasonable suspicion of illegal activity when they stopped Hernandez. In resolving this question, we review the district court’s factual findings for clear error and its legal conclusions de novo. United States v. Soto, 649 F.3d 406, 409 (5th Cir.2011).
When conducting roving patrols, border patrol agents may temporarily stop a vehicle “only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle’s occupant is engaged in criminal activity.” Id. (quoting United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir.2001)). The Supreme Court in Brignoni-Ponce articulated several factors for “deciding whether there is reasonable suspicion to stop a car in the border area.” United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). While we have not yet determined whether a “border area” has specific geographical limits, we need not make this determination today, as the stop in question fails under both the specific Brignoni-Ponce and the more general Terry inquiries. The Brignoni-Ponce factors include (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents’ experience in detecting illegal activity; (5) the driver’s behavior; (6) particular aspects or characteristics of the vehicle; (7) information regarding recent border crossings or narcotics transportation in the area; and (8) the number of passengers and their appearance and behavior. United States v. Moreno-Chaparro, 180 F.3d 629, 631-32 (5th Cir.1998).
The government relies primarily upon the following in arguing that Hernandez’s motion to suppress was properly denied: (1) the agents’ experience; (2) Hernán- *349 dez’s behavior; (3) the nature of the car; and (4) the passenger’s behavior. Considering the totality of the circumstances, however, we find this evidence unpersuasive.
This Court’s decision in United States v. Moreno-Chaparro is particularly instructive in analyzing the case now before us. In Moreno-Chaparro, officers stopped Moreno after he drove past a temporarily closed immigration checkpoint in a black Chevrolet pickup truck. As he passed the checkpoint, Moreno “slowed and appeared surprised to see the patrol car alongside the checkpoint,” but did not make eye contact with the agent. Id. at 631. The agent ran a license cheek and learned the car was registered to a woman in El Paso, Texas. Id. He then stopped Moreno and proceeded to question him and investigate the vehicle. Id.
The court first found the agent lacked reasonable grounds to believe Moreno had come from the border, as the stop occurred 60 miles north of the Mexican border. Id. at 632. It went on to note that, generally, whether a driver looks at an officer should be accorded little weight, because to find otherwise “would put the officers in a classic ‘heads I win, tails you lose’ position.” Id. (quoting United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir.1977)). Similarly, the court found the fact that the car Moreno was driving was registered to a woman was unavailing, because it was “obvious ... that it is not unusual for a man to drive a vehicle registered to a woman.” Id.
Moreover, the court declined to conclude the agent had reasonable suspicion because Moreno was driving a Chevy. The court stated that although “the Border Patrol carefully watches ‘Chevys in general,’ it would be manifestly unreasonable to target every Chevrolet pickup truck driven on Texas highways.” Id. Indeed, the court ultimately found the vehicle was “just an average pickup truck,” noting the “agent could not point to anything suspicious about [it].... It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground as if it were loaded down with people or contraband; it was neither particularly clean nor particularly dirty.” Id. at 632-33 (emphasis in original).
Here, the stop occurred 450 miles from the nearest international border crossing and, plainly, there are no reasonable grounds for assuming Hernandez had come from the border. See id. at 632. Although this factor alone is not controlling, it is vital, id., and, in its absence, “we examine the remaining factors charily.” United States v. Rico-Soto, 690 F.3d 376, 380 (5th Cir.2012) (citing United States v. Olivares-Pacheco, 633 F.3d 399, 402 (5th Cir.2011)).
Hernandez was stopped on Interstate 10, which is a major corridor for illegal alien-smuggling between cities in Texas, such as Houston, and the East Coast. Rico-Soto, 690 F.3d at 379. Agent Sullivan was a senior agent with 16 total years of experience, including four years in the Lake Charles area. These two factors, however, are the only ones that may weigh in favor of the stop; considered along with the remaining factors, the evidence fails to satisfy the agents’ claim to reasonable suspicion. First, the agents contend Hernandez’s driving posture was highly suspicious and indicated nervousness, because he had both hands on the steering wheel and was staring straight ahead rather than adopting a relaxed posture and talking on his cell phone, as many other drivers do. We will not say that a driver who has both hands on the wheel and is focusing on the road ahead of him — which is the ideal driving position — is acting in a manner indicative of criminal activity in a case such as *350 this. Indeed, it is counterintuitive to condone the notion that drivers are less likely to be stopped if they are talking on the phone and driving with one hand — or no hands — on the wheel than they are if they engage in safe driving practices.
Next, that Hernandez’s speed slowed considerably upon passing the border patrol agents is unpersuasive in this case. “This is the reaction of any cautious driver and due little weight.” United States v. Samaguey, 180 F.3d 195, 198-99 (5th Cir.1999). While continuing to drive below the speed limit may, combined with other circumstances, contribute to reasonable suspicion, the requisite circumstances are lacking here. See id. (finding the fact that Samaguey continued to drive under the speed limit contributed to reasonable suspicion when agents stopped him at 5:45 a.m. about 20 miles from the border, at a time and on a road known for smuggling of illegal aliens and drugs); United States v. Villalobos, 161 F.3d 285, 289-92 (5th Cir.1998) (holding deceleration “may be one factor contributing to the reasonable suspicion justifying a stop such as this one,” when Villalobos was stopped 59 miles north of the Mexican border after 2:20 a.m. on a route known for alien and drug trafficking (especially late at night), and the agents had a tip the car was likely smuggling drugs and observed the car driving in the lead car-load car arrangement). Thus, in this case we cannot find Hernandez’s speed change contributed to reasonable suspicion.
Further unavailing is the agents’ argument that Hernandez’s driving of a vehicle registered to a woman supports reasonable suspicion. First, we have previously noted “the obvious, i.e., that it is not unusual for a man to drive a vehicle registered to a woman.” Moreno-Chaparro, 180 F.3d at 632. This vehicle was not reported stolen, had no outstanding warrants or criminal activity associated with it, and had not recently been documented as crossing the border. Thus, that Hernandez was not the registered owner of the car is not, here, a contributing factor.
Moreover, the type of vehicle Hernandez was driving was not suspect. Although Agent Sullivan testified that smugglers frequently use SUVs like the Ford Explorer, “it would be manifestly unreasonable to target every” SUV driving on highways between Texas and the East Coast. See Moreno-Chaparro, 180 F.3d at 632-33. Agents Sullivan and Taylor identified nothing suspicious about this particular SUV— that is, they noted no aspects of the SUV that rendered it any more likely than other SUVs to be transporting illegal aliens. See Rico-Soto, 690 F.3d at 381. Indeed, it was only an average SUV on a Louisiana highway. See Moreno-Chaparro, 180 F.3d at 633.
Finally, the agents noticed only one passenger, seated in the front passenger’s side seat, who did not make eye contact with the agents and whose conversation with Hernandez stopped when the agents pulled alongside Hernandez, but resumed when the agents dropped back. This observation does not measurably contribute to reasonable suspicion in the absence of any other compelling evidence. We have previously held that “in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight.” Id. at 632. Similarly, conversations are subject to natural variation, waxing and waning at irregular intervals. If there were other strong indicators of reasonable suspicion, this factor may help contribute, but it is necessarily a weak factor and of especially light weight in a case such as this.
*351 B.
Although we have found the agents clearly violated the Fourth Amendment in stopping Hernandez, our inquiry does not end here, for we must further ask whether we may grant his motion to dismiss. We note that we may affirm the district court’s denial of a motion to suppress on any basis established in the record. United States v. Aguirre, 664 F.3d 606, 610 (5th Cir.2011), cert. denied — U.S.—, 132 S.Ct. 1949, 182 L.Ed.2d 803 (2012). When the agents illegally stopped Hernandez, he admitted that he was a Mexican citizen unlawfully present in the United States. This evidence led to and is the basis of Hernandez’s conviction and 33-month incarceration. This evidence is also what Hernandez now seeks to suppress.
This Court, however, has previously held that an alien’s INS file and even his identity itself are not suppressible. Roque-Villanueva, 175 F.3d at 346. In Roque-Villanueva, federal authorities learned of a deported alien’s unlawful reentry after an allegedly unconstitutional stop. Id. In reviewing the alien’s motion to suppress all evidence derived from the stop, this Court concluded neither his identity nor his INS file could be suppressed and affirmed the district court’s denial of the defendant’s motion. Id. Accordingly, we are bound by precedent and affirm the denial of Hernandez’s motion to suppress. The judgment of the district court is, therefore,
AFFIRMED.

. 8U.S.C. § 1326(a) and (b)(2).