[Cite as *State v. Lawler*, 2020-Ohio-849.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLANT,                   CASE NO.  14-19-25

      v.

ERICA S. LAWLER,                        O P I N I O N

      DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Trial Court No. 2018 CR 0231

Judgment Affirmed

Date of Decision:  March 9, 2020

APPEARANCES:

    *Andrew M. Bigler* for Appellant

    *Joshua A. Peistrup* for Appellee

**PRESTON, J.**

{¶1} Plaintiff-appellant, the State of Ohio, appeals the July 18, 2019 judgment of the Union County Court of Common Pleas granting the motion to suppress evidence of defendant-appellee, Erica S. Lawler ("Lawler"). For the reasons that follow, we affirm.

{¶2} This case arises from a January 16, 2018 traffic stop on US 33 near Marysville, Ohio. At approximately 5:15 p.m., Trooper Blake Prather ("Trooper Prather") of the Ohio State Highway Patrol was in his patrol vehicle monitoring westbound traffic. At that time, a Buick passed his patrol vehicle, and he noticed that the driver's arms were "locked out on the steering wheel" and that both the driver and the passenger "were sitting upright and rigid." (July 17, 2019 Tr. at 9-10). Based on these observations, Trooper Prather decided to follow the Buick, and at approximately 5:16 p.m., he stopped the Buick after witnessing the driver of the vehicle "move[] from the right lane to the left lane without the use of a turn signal to indicate their lane change." (*Id.* at 11).

{¶3} Trooper Prather identified Bradley Schidecker ("Schidecker") as the driver of the Buick. (*Id.* at 16). Lawler was identified as the passenger. (*Id.*). After speaking with Lawler and Schidecker for a few moments, Trooper Prather learned that neither Lawler nor Schidecker was the registered owner of the Buick. (*Id.*). Trooper Prather obtained the registered owner's contact information and returned

to his patrol vehicle at approximately 5:21 p.m. (*Id.* at 16-17, 22); (State's Ex. 1). Once inside his patrol vehicle, Trooper Prather radioed his dispatcher and asked the dispatcher to establish contact with the registered owner. (July 17, 2019 Tr. at 17). Trooper Prather also requested the assistance of a canine unit "off of the behavior[s] [he] observed" prior to returning to his patrol vehicle. (*Id.*).

{¶4} At approximately 5:24 p.m., Trooper Prather was informed by the dispatcher that although Lawler and Schidecker were allowed to use the Buick, Schidecker was not supposed to be driving. (*Id.* at 22-23). By that time, Trooper Prather had also discovered that Schidecker's license was suspended. (*Id.* at 26). However, after learning this information, Trooper Prather did not return to the Buick to speak to Lawler and Schidecker. Instead, Trooper Prather waited in his patrol vehicle for approximately 25 minutes until the canine unit arrived on scene at 5:49 p.m. (*Id.* at 24-25, 33). At 5:52 p.m., about 36 minutes after Trooper Prather first stopped the Buick, the drug-detection dog was led to the vehicle, and shortly thereafter, it alerted to the presence of drugs. (*Id.* at 41-42); (State's Ex. 1). A subsequent search of the vehicle yielded roughly 2 grams of suspected heroin, 23.6 grams of suspected methamphetamine, drug paraphernalia, a small digital scale, and other items associated with drug trafficking.

{¶5} On September 11, 2018, the Union County Grand Jury indicted Lawler on five counts: Count One of aggravated possession of drugs in violation of R.C.

2925.11(A), (C)(1)(a), a fifth-degree felony; Count Two of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2), (C)(1)(d), a second-degree felony; Count Three of possession of heroin in violation of R.C. 2925.11(A), (C)(6)(b), a fourth-degree felony; Count Four of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(c), a second-degree felony; and Count Five of illegal use or possession of drug paraphernalia in violation of R.C. 2925.14(C)(1), (F)(1), a fourth-degree misdemeanor. (Doc. No. 1). On April 22, 2019, Lawler appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 6).

{¶6} On June 26, 2019, Lawler filed a motion to suppress evidence. (Doc. No. 18). In her motion to suppress, Lawler argued that the evidence seized from the Buick during the traffic stop should be suppressed because Trooper Prather unreasonably prolonged the traffic stop while awaiting the arrival of the drug-detection dog. (*Id.*).

{¶7} A hearing on Lawler's motion to suppress evidence was held on July 17, 2019. (Doc. No. 26); (July 17, 2019 Tr. at 1). On July 18, 2019, the trial court granted Lawler's suppression motion and ordered that the evidence obtained from the search of Buick be suppressed. (Doc. No. 26).

{¶8} On July 22, 2019, the State filed a notice of appeal and a certification pursuant to Crim.R. 12(K). (Doc. Nos. 32, 35). It raises one assignment of error for our review.

**Assignment of Error**

**The trial court erred by finding the totality of the circumstances did not justify prolonging defendant's traffic stop to allow for a canine to arrive at the scene and conduct a sniff of the vehicle.**

{¶9} In its assignment of error, the State argues that the trial court erred by granting Lawler's motion to suppress evidence. Specifically, the State argues that the trial court erred by concluding that Trooper Prather did not have a reasonable, articulable suspicion to justify prolonging the traffic stop.

{¶10} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶11} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from

unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7, citing *State v. Orr*, 91 Ohio St.3d 389, 391 (2001). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996), citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391 (1979), *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074 (1976), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574 (1975). The individuals "seized" during the stop of an automobile by law enforcement officers include persons riding in the automobile as passengers. *Brendlin v. California*, 551 U.S. 249, 251, 127 S.Ct. 2400 (2007); *State v. Clark*, 6th Dist. Wood No. WD-17-025, 2018-Ohio-2029, ¶ 22, quoting *State v. Carter*, 69 Ohio St.3d 57, 63 (1994). Because an automobile stop involves the seizure of persons within the meaning of the Fourth Amendment, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren* at 810. A traffic stop is reasonable, and therefore constitutionally permissible, if it is supported either by probable cause or by a reasonable, articulable suspicion that a motorist has committed, is committing, or is about to commit a crime, including a violation of the traffic laws. *State v. Moiduddin*, 3d Dist. Union No. 14-18-15, 2019-Ohio-3544, ¶ 11. However,

Case No. 14-19-25

"[w]hen police stop a vehicle without either probable cause or a reasonable articulable suspicion of criminal activity, the seizure is violative of constitutional rights and evidence derived from such a stop must be suppressed." *Clark* at ¶ 22, citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684 (1961).

{¶12} In her motion to suppress, Lawler did not challenge the constitutionality of the initial stop of the vehicle, and after reviewing the record, we are satisfied that Trooper Prather had probable cause to stop the vehicle after he observed Schidecker fail to signal a lane change in violation of R.C. 4511.39. *State v. Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, ¶ 16 ("[I]f a traffic stop is based on a traffic violation, such as one's failure to signal a turn, which occurred in the officer's presence, the officer possesses probable cause to stop the vehicle and the stop is constitutionally valid."), citing *Dayton v. Erickson*, 76 Ohio St.3d 3, 11 (1996). Instead, Lawler argued that the evidence seized from the vehicle should be suppressed because Trooper Prather unreasonably prolonged the traffic stop to await the arrival of the drug-detection dog.

{¶13} "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834 (2005), citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652 (1984). For example, "[a] seizure that is justified solely by the interest in issuing a * * * ticket

to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

{¶14} "'When an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning.'" *State v. Hall*, 2d Dist. Darke No. 2016-CA-13, 2017-Ohio-2682, ¶ 8, quoting *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, citing *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 12; *State v. Troutman*, 3d Dist. Marion No. 9-11-17, 2012-Ohio-407, ¶ 22 ("[T]he duration of the stop 'is limited to "effectuate the purpose for which the initial stop was made."'"), quoting *State v. Smith*, 117 Ohio App.3d 278, 285 (1st Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 655 (4th Dist.1994). "'The reasonable stop time includes the amount of time it takes to conduct a computer check on the driver's license, registration, and vehicle plates.'" *Hall* at ¶ 8, quoting *Hill* at ¶ 9; *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S.Ct. 1609 (2015) ("[A]n officer's mission includes 'ordinary inquiries incident to [the traffic] stop' * * * [such as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."), quoting *Caballes* at 408. "'"In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer

-8-

diligently conducted the investigation.""" *Batchili* at ¶ 12, quoting *State v. Howard*, 12th Dist. Preble Nos. CA2006-02-002 and CA2006-02-003, 2006-Ohio-5656, ¶ 15, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598-599 (9th Dist.1995).

{¶15} In contrast, a canine sniff, because it is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" "[l]ack[s] the same close connection to roadway safety as the ordinary inquiries" and is thus "not fairly characterized as part of [a law enforcement] officer's traffic mission." *Rodriguez* at 355-356, quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41, 121 S.Ct. 447 (2000). Nevertheless, a law enforcement officer is not constitutionally prohibited from conducting a canine sniff of a vehicle during the course of a lawful traffic stop. An exterior sniff of a vehicle by a trained drug-detection dog does not constitute a "search" within the meaning of the United States Constitution or the Ohio Constitution. *State v. Mote*, 3d Dist. Mercer No. 10-15-05, 2015-Ohio-3715, ¶ 17, quoting *State v. Cahill*, 3d Dist. Shelby No. 17-01-19, 2002-Ohio-4459, ¶ 22, quoting *State v. Rusnak*, 120 Ohio App.3d 24, 28 (6th Dist.1997) and citing *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637 (1983); *State v. Alexander-Lindsey*, 4th Dist. Lawrence No. 15CA11, 2016-Ohio-3033, ¶ 36, quoting *State v. Waldroup*, 100 Ohio App.3d 508, 514 (12th Dist.1995). Consequently, a law enforcement officer may conduct a canine sniff of a vehicle without reasonable suspicion of additional illegal activity, provided that "'the officer conducts [the] canine sniff of

the vehicle before the reasonable completion of the traffic stop procedures * * *.'" *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 22, quoting *State v. Elliott*, 7th Dist. Mahoning No. 11 MA 182, 2012-Ohio-3350, ¶ 23, citing *State v. Winger*, 2d Dist. Darke No. 1688, 2007-Ohio-2605, ¶ 17.

{¶16} "'However, if the officer extends the traffic stop in order to conduct a canine sniff, he must have reasonable suspicion that the vehicle contains drugs in order to detain the driver while a canine unit is brought to the scene.'" *Id.*, quoting *Elliott* at ¶ 23. *See Batchili* at ¶ 15 (noting that "'the detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop'"), quoting *Howard* at ¶ 16; *Troutman* at ¶ 23-24. Reasonable, articulable suspicion "exists when there are '"specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."'" *Troutman* at ¶ 24, quoting *State v. Stephenson*, 3d Dist. Union No. 14-04-08, 2004-Ohio-5102, ¶ 16, quoting *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988). "In forming reasonable articulable suspicion, law enforcement officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" *Id.* at ¶ 25, quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002), quoting *United States v. Cortez*,

449 U.S. 411, 417-418, 101 S.Ct. 690 (1981). "'The "reasonable and articulable suspicion" analysis is based on the *collection* of factors, not on the individual factors themselves.'" (Emphasis sic.) *Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, at ¶ 12, quoting *Batchili* at ¶ 19.

{¶17} In its judgment granting Lawler's suppression motion, the trial court found as follows:

> [Trooper] Prather testified he stopped a westbound Buick driven by *
> * * Schidecker at 5:16 p.m. [Lawler] was a passenger. The stop was
> for a traffic offense of failure to signal a lane change. Within eight *
> * * minutes the trooper found Schidecker's license was suspended and
> that the owner of the car had loaned it to [Lawler]. The officer
> requested a "drug dog" come to the scene to sniff for drugs. The
> driver and [Lawler] were detained for approximately twenty-eight
> minutes while a drug dog from the Hilliard Police Department was
> brought to [the] scene.

(Doc. No. 26). In addition, the trial court found that Trooper Prather "relied on body language and inconsistent statements to justify holding [Lawler and Schidecker] for almost * * * half an hour for a drug dog to be brought to the scene." (*Id.*).

{¶18} At the July 17, 2019 suppression hearing, Trooper Prather testified that on January 16, 2018 at approximately 5:15 p.m., he was stationed on US 33 near

Marysville, Ohio when he observed a westbound Buick pass his marked patrol vehicle. (July 17, 2019 Tr. at 7-9). Trooper Prather stated that the Buick caught his attention because "the driver and the passenger were sitting upright and rigid" and the "driver had his arms locked out on the steering wheel." (*Id.* at 9-10). He testified that the driver was "pushed back into the seat almost as if to avoid being seen." (*Id.* at 10). Trooper Prather stated that he regarded the driver's and passenger's behaviors as abnormal and that, consequently, he decided to follow the Buick. (*Id.* at 10-11). Trooper Prather conceded that when he decided to follow the Buick, he did not have probable cause or reasonable suspicion to stop the vehicle. (*Id.* at 11). However, according to Trooper Prather, after following the Buick for a short period of time, he observed the Buick move "from the right lane to the left lane without the use of a turn signal to indicate their lane change." (*Id.*). Trooper Prather testified that he then activated his overhead lights and effected a stop of the Buick. (*Id.* at 11-12).

{¶19} Trooper Prather stated that when he approached the Buick, "the first thing that really caught [his] eye was the driver threw his head back against the seat," which was "out of the ordinary for what [he] usually see[s]" and an "odd" reaction to being stopped for a "seemingly minor infraction." (*Id.* at 15). Trooper Prather also noted that when he approached the passenger side of the vehicle, the passenger-side window was rolled only halfway down. (*Id.*). Trooper Prather

-12-

testified that after identifying Lawler and Schidecker as the occupants of the Buick, he learned that the vehicle was not registered to Lawler or Schidecker. (*Id.* at 16). He stated that he obtained the registered owner's telephone number "to see if [Schidecker and Lawler] were allowed to use the vehicle." (*Id.*). He testified that when he inquired why Lawler and Schidecker were using a vehicle that neither of them owned, they explained that "they were going to be babysitting for a friend," though "[n]either one of them [were] from the area according to their licenses." (*Id.* at 16-17).

{¶20} Trooper Prather stated that after speaking with Lawler and Schidecker, he returned to his patrol vehicle, provided dispatch with the telephone number of the Buick's registered owner, and "ask[ed] dispatch to contact her to verify that [Lawler and Schidecker] were supposed to have the vehicle." (*Id.* at 17); (State's Ex. 1). He testified that he also "requested a canine off of the behavior that [he] observed prior to the stop and walking up to the car." (July 17, 2019 Tr. at 17). Trooper Prather testified that, based on his training and experience, he suspected potential criminal activity because Lawler and Schidecker were both "staring straight ahead sitting upright and rigid" in the Buick, the passenger-side window was rolled only halfway down, which was "out of the ordinary" but "not necessarily indicative of anything huge," and Schidecker "threw his head back" against his

headrest. (*Id.* at 19-21). Trooper Prather explained why he found it particularly "odd" that Schidecker hit his head against his headrest:

> [I]f you're just on a traffic stop, * * * in my opinion, there's no reason to throw your head back against the seat almost in * * * like an oh, crap situation. That was my suspicion when I walked up there that there was no reason to do that. And then I asked if his license was suspended thinking that that may be the reason to do that. Because I have pulled over a lot of people that have suspended licenses, and they are a little bit more amped up than usual. When [Schidecker] said that [his license] should be valid, that automatically threw that out of my mind. You know, if you're saying that you should be valid, you should not have a reaction like that.

(*Id.* at 20). Trooper Prather stated that after Schidecker told him that his license "should be valid," he eliminated driving under suspension as an explanation for Schidecker's behaviors. (*Id.* at 20-21).

{¶21} Trooper Prather testified that he requested the canine unit at approximately 5:21 p.m., roughly 5 minutes after he activated his overhead lights to initiate the traffic stop. (*Id.* at 22); (State's Ex. 1). He stated that the canine unit arrived around 5:49 p.m., approximately 33 minutes after the Buick was stopped. (July 17, 2019 Tr. at 22, 24-25); (State's Ex. 1).

{¶22} Trooper Prather testified that while he was waiting for his dispatcher to contact the registered owner of the Buick, he conducted a check of Schidecker's license and learned that Schidecker's license was, in fact, suspended. (July 17, 2019 Tr. at 26). He stated that this information was "contrary" to Schidecker's previous statement that his license "should be valid." (*Id.*).

{¶23} Trooper Prather testified that at 5:24 p.m., about 8 minutes after he initiated the traffic stop, his dispatcher informed him that the Buick's registered owner had been contacted and that the registered owner "said that [Schidecker] was not supposed to be driving the vehicle, and [Lawler] was only supposed to have the vehicle to go to the store." (*Id.* at 23); (State's Ex. 1). According to Trooper Prather, the registered owner's statement that the Buick was supposed to be used for the limited purpose of going to the store was significant because "[it was] completely different than why [Lawler and Schidecker] said they had the vehicle in the first place." (July 17, 2019 Tr. at 23). He stated that both Lawler and Schidecker have Columbus-area addresses and that because "[t]here are numerous stores between Columbus and Marysville, many of which are the same type of store that [they] could have gone to," "there appeared to be no reason to be in Marysville, specifically." (*Id.*). Trooper Prather remarked that the registered owner's statement "mean[t] that [he] had been lied to while [he] was standing at the side of the car" and that it was a "major problem" that Schidecker was driving the Buick when the

registered owner said that he should not be driving. (*Id.*). Trooper Prather indicated that he believed that Lawler and Schidecker were being deceptive, which is another indicator of potential criminal activity. (*Id.* at 23-24).

{¶24} On cross-examination, Trooper Prather testified that after stopping the Buick and speaking with Lawler and Schidecker, he returned to his patrol vehicle at approximately 5:21 p.m., which was roughly 5 minutes after he first stopped the vehicle. (*Id.* at 27). Trooper Prather confirmed that he requested the canine unit immediately on returning to his patrol vehicle and that he learned that Schidecker's license was suspended approximately 6 to 7 minutes after stopping the Buick. (*Id.*). He also confirmed that at 5:24 p.m., he learned that the Buick was not stolen but that Schidecker was not supposed to be driving it. (*Id.* at 31). However, Trooper Prather never spoke directly with the registered owner of the Buick, and he did not get any of the "specific details" from the owner concerning Lawler and Schidecker's use of the vehicle. (*Id.* at 37-38). He testified that he knew that Schidecker's license was suspended before he learned that Schidecker was not supposed to be driving the Buick. (*Id.* at 32). Trooper Prather stated that the next time he spoke to Lawler and Schidecker after he had returned to his patrol vehicle was at approximately 5:48 or 5:49 p.m. when the canine unit arrived. (*Id.* at 32-33). He agreed that he sat in his patrol vehicle "for at least 25 minutes" before the canine unit arrived. (*Id.* at 33). Trooper Prather testified that the exterior sniff of the vehicle was not performed

until around 5:52 p.m., approximately 36 minutes after he originally stopped the Buick. (*Id.* at 41-42); (State's Ex. 1).

{¶25} Trooper Prather testified that during the 25 minutes that he waited for the canine unit to arrive, he was "just waiting for [the] canine" and did not "do anything additional to further the search or [his] investigation." (July 17, 2019 Tr. at 33). He stated that because "the vehicle was under an unauthorized use [as Schidecker was] not supposed to be driving it," he would not have permitted Lawler and Schidecker to leave until he finished, which meant until the canine unit arrived. (*Id.*). Trooper Prather agreed that, "[b]ased on the fact that that car wasn't supposed to be driven by [Schidecker]," he "would have waited another half an hour * * * for that canine to show up because it was en route" from Hilliard. (*Id.* at 37).

{¶26} Trooper Prather testified that if he "were under ideal situations and * * * had everything in front of [him] at the time and * * * [was not] waiting for any other information from [his] dispatch," he could write a citation in "three to four minutes." (*Id.* at 30). When asked whether he had "all the information [he] needed at [5:24 p.m.] to issue any citation for any information that [he] had as a result of [his] investigation," Trooper Prather responded that he did. (*Id.* at 32, 39-40). Trooper Prather testified that he ultimately cited Schidecker for driving under suspension and for failing to use his turn signal. (*Id.* at 38). However, he stated that he did not cite Schidecker for unauthorized use of a motor vehicle, and he could not

recall whether he cited Lawler and Schidecker for failing to wear their seatbelts. (*Id.* at 38-39). Trooper Prather agreed that he "[c]ould have" made the decision whether to cite Schidecker for unauthorized use of a motor vehicle based on the information he possessed at 5:24 p.m., but that he "did not." (*Id.* at 39).

{¶27} Trooper Prather testified that he did not detect the smell of marijuana in the Buick, that he did not see anything thrown from the vehicle, and that he did not see any drugs, drug paraphernalia, or potential stolen property in the vehicle. (*Id.* at 35-36). Trooper Prather also testified that there was snow on the ground on the day of the traffic stop and that it "was not warm." (*Id.* at 28); (State's Ex. 1).

{¶28} On redirect examination, Trooper Prather testified that when the registered owner of a stopped vehicle is not in the vehicle, it is common practice to "exhaust all means" to contact the registered owner of the vehicle to "make sure that the vehicle * * * is supposed to be there with the people that are occupying that vehicle." (July 17, 2019 Tr. at 43). Finally, Trooper Prather reiterated that he would need "[t]hree to four minutes under completely ideal circumstances" to write a traffic citation, and he suggested that the circumstances were not completely ideal on the day of the traffic stop, though he did not provide an estimate of how long it would have taken him to write a citation under the circumstances. (*Id.* at 45).

{¶29} Based on the foregoing review of the record, we conclude that competent, credible evidence supports the trial court's findings of fact. *See*

*Moiduddin*, 2019-Ohio-3544, at ¶ 13.  Hence, we accept and defer to the trial court's findings.  *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.  Yet, the State maintains that one of the trial court's findings of fact—that Trooper Prather "relied on body language and inconsistent statements to justify holding [Lawler and Schidecker] for almost * * * half an hour for a drug dog to be brought to the scene"—is not supported by the record.  (Appellant's Brief at 6-7).  The State argues that the trial court's findings of fact are incomplete because it did not consider that Schidecker "explicitly did not have consent to be driving" or that Trooper Prather "believed there could be a possible unauthorized use of a motor vehicle violation, and his investigation shifted along those lines approximately 8 minutes after the traffic stop began."  (*Id.* at 7).  The State thus asserts that Trooper Prather's prolonged detention of Lawler was based on more than "body language and inconsistent statements."  It contends that Trooper Prather's prolongation of the traffic stop was justified because the "totality of the circumstances gives rise to a reasonable and articulable suspicion of at least a violation of R.C. 2913.03(A)."[1]  (*Id.* at 8).

{¶30} We disagree.  Although Trooper Prather may well have had reason to extend the traffic stop for some period of time beyond that which was necessary to

---

[1] R.C. 2913.03(A) provides, in relevant part, that "[n]o person shall knowingly use or operate [a] * * * motor vehicle * * * without the consent of the owner or person authorized to give consent."  Generally, a violation of R.C. 2913.03(A) is a first-degree misdemeanor.  R.C. 2913.03(D)(2).

investigate Schidecker's failure to signal a lane change and issue a warning or citation, Trooper Prather's suspicion that Schidecker violated R.C. 2913.03, or that Schidecker committed other traffic offenses such as driving under suspension, did not justify the length of the detention at issue in this case. Once Trooper Prather's dispatcher informed him that Schidecker was not permitted to drive the Buick, Trooper Prather encountered facts that would support a reasonable, articulable suspicion that Schidecker was violating or had violated R.C. 2913.03. Consequently, Trooper Prather might have been justified in prolonging the traffic stop for some period of time to investigate Schidecker's potential violation of R.C. 2913.03. *See Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, at ¶ 15. Likewise, when Trooper Prather learned that Schidecker's license was suspended, he might have been able to extend the traffic stop in order to cite Schidecker for driving under suspension and to determine whether Lawler was capable of safely and legally driving the Buick away from the traffic stop.

{¶31} However, even with reasonable suspicion to believe that Schidecker had violated R.C. 2913.03 or that he was driving under suspension, Trooper Prather would have been justified in extending the duration of the traffic stop only for such time as would have been reasonably necessary to investigate these additional potential infractions. *See United States v. Spears*, 636 Fed.Appx. 893, 901 (5th Cir.2016) ("'If the officer develops reasonable suspicion of additional criminal

activity, * * * he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion.'"), quoting *United States v. Andres*, 703 F.3d 828, 833 (5th Cir.2013); *United States v. Winters*, 782 F.3d 289, 296 (6th Cir.2015) (the extension of a traffic stop based on new reasonable suspicion "'must be "limited in scope and duration."'"), quoting *United States v. Johnson*, 482 Fed.Appx. 137, 143 (6th Cir.2012), quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983). In assessing whether a law enforcement officer reasonably extended the duration of a traffic stop, this court must "'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Troutman*, 2012-Ohio-407, at ¶ 38, quoting *United States v. Sharpe*, 470 U.S. 675, 686-687, 105 S.Ct. 1568 (1985). Therefore, while Trooper Prather may have acquired additional reasonable suspicion sufficient to prolong the traffic stop, "the more important question is whether [Trooper Prather] diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Id.* at ¶ 40.

{¶32} From the record before us, we cannot conclude that Trooper Prather diligently pursued a means of investigation likely to confirm or dispel his suspicions that Schidecker had violated R.C. 2913.03 or that he was driving under suspension. The record reflects that by 5:24 p.m., 8 minutes after the initial traffic stop, Trooper

Prather had learned that Schidecker's license was suspended and that Schidecker did not have permission to drive the Buick. Yet, for the next 24-25 minutes, Trooper Prather sat in his patrol vehicle. He did not approach the Buick to reestablish contact with Schidecker and Lawler, and he did not attempt to communicate further with the vehicle's registered owner. By Trooper Prather's own admission, he did not "do anything additional to further the search or [his] investigation"; he was "just waiting for [the] canine." (July 17, 2019 Tr. at 33). Finally, and perhaps most importantly, the drug-detection dog could not possibly have advanced Trooper Prather's investigation because an exterior sniff of a vehicle cannot confirm or dispel a suspicion that the driver is driving the vehicle without the owner's consent or with a suspended license. In other words, prolonging a vehicle stop to await the arrival of a drug-detection dog is not a reasonable way to investigate whether the driver is authorized to drive the vehicle or whether the driver is properly licensed. Therefore, the length of the detention at issue in this case was not justified by Trooper Prather's suspicions that Schidecker had violated R.C. 2913.03 or that Schidecker was driving under suspension because Trooper Prather did not investigate these suspicions in a reasonable manner. *See Troutman* at ¶ 40-43.

{¶33} Moreover, we are unable to conclude that the sniff by the drug-detection dog occurred within the period of time reasonably required for Trooper Prather to complete the tasks associated with the initial traffic stop or with

Schidecker's possible driving-under-suspension offense and violation of R.C. 2913.03. Trooper Prather testified that by 5:24 p.m., when he learned that Schidecker's license was suspended and that Schidecker was not supposed to be driving the Buick, he had all the information he needed to issue any citations to Schidecker and Lawler. (*See* July 17, 2019 Tr. at 32, 39-40). Trooper Prather specifically stated that he "could have" made the decision to cite Schidecker for unauthorized use of a motor vehicle based on the information he had at 5:24 p.m. (*Id.* at 39). Although Trooper Prather testified that it takes him 3 to 4 minutes to complete a traffic citation under ideal circumstances, he seemed to suggest that conditions were not ideal at the time, and our survey of relevant case law reveals that the preparation of traffic citations and criminal summonses often requires more than 3 to 4 minutes. (*Id.* at 45). *See In re $75,000.00 U.S. Currency*, 8th Dist. Cuyahoga No. 105314, 2017-Ohio-9158, ¶ 27 (noting that some Ohio courts have held that "the longest a traffic stop and citation issuance should take is approximately 15 minutes"); *State v. Eggleston*, 11th Dist. Trumbull No. 2014-T-0068, 2015-Ohio-958, ¶ 12 (documenting officer's testimony that "it generally takes 8-10 minutes to issue a summons or citation for a traffic violation" and "10-15 minutes to complete a summons" when a stop results in criminal charges); *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, ¶ 5, 17 (2d Dist.) (assuming, with

reservations, that 30 minutes was a reasonable length of time to process citations for a marked-lane violation, an expired license, and a seatbelt violation).

{¶34} Nevertheless, even allowing Trooper Prather significantly more than 3 to 4 minutes to determine whether to cite Schidecker and Lawler and prepare the citations or summonses, and yet more time to provide Schidecker and Lawler with the citations or summonses and determine whether Lawler would be permitted to drive the Buick away, there is no evidence in the record that Trooper Prather undertook a diligent effort to complete any of these tasks. *See Ramos* at ¶ 17. While Trooper Prather ultimately cited Schidecker for failing to signal a lane change and for driving under suspension, the record does not clearly indicate whether Trooper Prather began writing the citations during the 25-minute period that he waited in his patrol vehicle for the drug-detection dog or whether he prepared the citations at some point after the dog had arrived.

{¶35} To the extent that the record does speak to Trooper Prather's efforts, it suggests that he did little to process the traffic stop while he waited for the drug-detection dog. (*See* July 17, 2019 Tr. at 33) (testifying that he "just wait[ed] for [the] canine" and did not "do anything additional to further the search or [his] investigation"). Furthermore, Trooper Prather testified that Schidecker and Lawler would not have been free to leave until the canine unit arrived and that he would have waited another half-hour for the canine unit. (*Id.* at 33, 37). Thus, not only

does the record document Trooper Prather's apparent lack of activity in processing the traffic stop, it suggests that Trooper Prather's primary motivation for extending the traffic stop may have been to allow for an exterior sniff of the Buick. Stated differently, there is "'some evidence that the normal procedures were delayed for reasons unrelated to the investigation of the traffic violation[s] * * *.'" *State v. Blatchford*, 12th Dist. Preble No. CA2015-12-023, 2016-Ohio-8456, ¶ 32, quoting *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 23. Accordingly, we conclude that the dog sniff did not occur within the time reasonably necessary to complete the traffic-related investigation and that the traffic stop was therefore prolonged by the dog sniff. *See Hall*, 2017-Ohio-2682, at ¶ 11-13 (concluding that "[e]ven if the canine sniff occurred within the 12 to 13 minutes that it typically took [the officer] to issue a citation," the officer "indisputably added time to the stop" by "doing nothing for eight minutes while awaiting a canine unit"); *Eggleston* at ¶ 25-28 (holding that the officer unreasonably prolonged the traffic stop where he "waited a period of time, surrounded by at least four other officers, before beginning to issue a summons * * * solely * * * because he was waiting for the K-9 unit to arrive"); *Elliott*, 2012-Ohio-3350, at ¶ 25-28 (concluding that the officer "acted unreasonably in failing to write the traffic citation and in failing to conduct the field sobriety tests while detaining appellant for [a] half-hour waiting for a canine unit to arrive"); *Ramos* at ¶ 17-18.

**{¶36}** Even so, the fact that a traffic stop was continued beyond the time reasonably required to complete the traffic-related investigation does not necessarily mean that the stop was unconstitutionally prolonged. It is well established that if a law enforcement officer has a reasonable, articulable suspicion that a vehicle contains drugs or that the vehicle's occupants are engaged in drug-related activity, the officer may detain the vehicle and its occupants beyond the time reasonably necessary to complete the traffic-related investigation in order to allow a drug-detection dog to be brought to the scene. *Blatchford* at ¶ 28, quoting *Neal* at ¶ 13; *Casey*, 2014-Ohio-2586, at ¶ 22; *Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, at ¶ 13. *See Rodriguez*, 575 U.S. at 355; *Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, at ¶ 15. Although the trial court's conclusion is not perfectly clear, it seems to have concluded that Trooper Prather lacked reasonable suspicion to believe that the Buick contained drugs or that Schidecker and Lawler were engaged in drug-related activity. (*See* Doc. No. 26). Specifically, the trial court appears to have held that Schidecker's and Lawler's "body language" and "inconsistent statements" "did not rise to the standard of a reasonable suspicion" of drug-related activity required to detain them until the drug-detection dog arrived. (*Id.*).

**{¶37}** We conclude that the trial court did not err by holding that Trooper Prather did not have a reasonable, articulable suspicion that the Buick contained drugs or that Schidecker and Lawler were engaged in drug-related activity. Here,

Trooper Prather relied, to some degree, on each of the following factors to justify prolonging the detention of Schidecker and Lawler: (1) Schidecker's and Lawler's rigid, upright postures and their failure to look at Trooper Prather as they passed his patrol vehicle; (2) the fact that Schidecker "threw his head" against his headrest as Trooper Prather approached the Buick; (3) the fact that the passenger-side window was rolled only halfway down; (4) Schidecker's suspended license and the fact that he misrepresented that his license was valid; (5) Schidecker's potential unauthorized use of the Buick; (6) the discrepancy between Schidecker and Lawler's explanation that they were using the Buick to babysit and the owner's statement that Lawler was supposed to use the Buick to go to the store; and (7) the fact that Schidecker and Lawler did not need to be in Marysville to go to the store because they could have gone to one of many stores closer to their Columbus-area addresses. We recognize that in evaluating whether Trooper Prather had a reasonable, articulable suspicion of drug-related activity, we must refrain from considering whether any one of Trooper Prather's observations was "itself readily susceptible to an innocent explanation" and instead focus on whether the *collection* of factors, including those factors that may appear unsuspicious in isolation, cumulatively supports a finding of reasonable suspicion. *Arvizu*, 534 U.S. at 274; *Batchili* at ¶ 19. Nonetheless, in considering whether the factors articulated by Trooper Prather amount to a reasonable suspicion of drug-related activity when considered together, it is

appropriate to assess the extent to which a given factor is indicative of criminal activity. *See United States v. Bowman*, 884 F.3d 200, 214 (4th Cir.2018); *United States v. Stepp*, 680 F.3d 651, 665-667 (6th Cir.2012); *United States v. Townsend*, 305 F.3d 537, 542-545 (6th Cir.2002).

**{¶38}** The first factor—Schidecker's and Lawler's unrelaxed postures and the fact that they "star[ed] straight ahead" as they passed Trooper Prather—is appropriately considered as a potential indicator of criminal activity by some courts. *See State v. Stephenson*, 12th Dist. Warren No. CA2014-05-073, 2015-Ohio-233, ¶ 23 (considering trooper's observations that the driver's arms were "locked out" and that both driver and passenger were "staring straight ahead" and had "rigid postures" as factors supporting reasonable suspicion). However, we are hesitant to draw too strong an association between lawful, safe driving behavior and criminal activity. *See United States v. Hernandez-Mandujano*, 721 F.3d 345, 349-350 (5th Cir.2013) ("[I]t is counterintuitive to condone the notion that drivers are less likely to be stopped if they are talking on the phone and driving with one hand—or no hands— on the wheel than they are if they engage in safe driving practices."); *United States v. Dukes*, 257 Fed.Appx. 855, 856 (6th Cir.2007), fn. 1; *State v. Davis*, 9th Dist. Lorain No. 14CA010639, 2015-Ohio-4218, ¶ 28 (Moore, J., concurring). In addition, we are dubious that Schidecker and Lawler's failure to look at Trooper

Prather constituted highly suspicious behavior. *See Hernandez-Mandujano* at 349; *Dukes* at 856, fn. 1. As explained by the Fifth Circuit Court of Appeals:

> [T]he government has * * * on some occasions contend[ed] that it is suspicious for a person to look and on other occasions insist[ed] that it is suspicious not to look. * * * [I]n the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight. To conclude otherwise "would put the officers in a classic 'heads I win, tails you lose' position. The driver, of course, can only lose."

*United States v. Moreno-Chaparro*, 180 F.3d 629, 632 (5th Cir.1998), quoting *United States v. Escamilla*, 560 F.2d 1229, 1233 (5th Cir.1977). Therefore, although these behaviors are relevant to the formation of reasonable suspicion, we find them to be relatively weak indicators of criminal activity generally and of drug-related activity specifically.

{¶39} Likewise, we find that the second and third factors—Schidecker's act of hitting his head against his headrest and the partially rolled down passenger-side window—carry little to no weight. We defer to Trooper Prather's assessment that Schidecker exhibited irregular behavior by banging his head against his headrest in an apparently exaggerated fashion. Nevertheless, given the frustration that even the most law-abiding of citizens can experience when stopped by the police and the

various ways that a person might vent their frustrations, Schidecker's conduct was not so far outside the bounds of ordinary behavior as to be considered strongly suggestive of drug-related activity. Furthermore, we find no significance in the fact that the passenger-side window was only partially rolled down. Schidecker and Lawler were stopped in the early evening on a frigid day in mid-January. While it might be abnormal for a person to roll down their window only partially on a warm evening, it is hardly out of place or surprising on a cold day.

{¶40} The fourth factor—Schidecker's suspended license and the fact that he misrepresented that his license was valid—is somewhat, but not strongly, indicative of additional criminal activity in this case. First, we question whether the record actually supports that Schidecker misrepresented the status of his license. Trooper Prather's only testimony on this point was that Schidecker stated that his license "should" be valid. (July 17, 2019 Tr. at 20-21). Thus, it is unclear whether Schidecker lied to Trooper Prather or whether he was simply mistaken about the status of his license. Regardless, "driving with a suspended license can 'contribute to the formation of an objectively reasonable suspicion of illegal activity.'" *United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir.2015), quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998), citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995), and citing *United States v. Pack*, 612 F.3d 341, 361 (5th Cir.2010). This is in part because "licenses are usually suspended for less than

law abiding conduct." *Pack* at 361. Yet, there is nothing in the record indicating definitively whether Schidecker's license was suspended for a drug-related offense or whether Schidecker's license was suspended for some other reason, such as the accumulation of points on his driving record. The reason for Schidecker's license suspension has some bearing on the formation of reasonable suspicion because a license suspension for drug-related offenses would be "related to the same suspicions that [Trooper Prather] was developing—that [Schidecker and Lawler] might be involved in drug trafficking," whereas a license suspension for a non-drug-related reason would not relate as strongly to Trooper Prather's suspicions of drug activity. *See Stepp*, 680 F.3d at 667. Accordingly, under the known facts of this case, Schidecker's license suspension is only a slight indicator of his and Lawler's involvement in drug-related activity.

{¶41} In addition, we do not find that the fifth factor—Schidecker's potential unauthorized use of the Buick—is a particularly strong indicator of drug-related activity, at least under the facts of this case. In some cases, courts have given weight to the fact that none of the occupants of a vehicle was expressly authorized to drive the vehicle. *E.g.*, *Winters*, 782 F.3d at 300-301 (giving "some weight" to the fact that the occupants of a rental car, which was rented by a third party who was not in the vehicle, were not listed as authorized drivers in the rental agreement). However, the fact that the driver of a vehicle does not have permission to operate the vehicle

is "noticeably less suspicious" when the owner or authorized driver is present in the vehicle. *See Stepp* at 666. Here, although Schidecker may not have been authorized to drive the Buick, Lawler did have the owner's permission to operate the vehicle and she was in the vehicle with Schidecker during the traffic stop. Under the circumstances of this case, we fail to see how Schidecker's operation of the vehicle suggested involvement in drug-related activity much more strongly than Lawler's operation of the vehicle would have. As a result, we find Schidecker's possible unauthorized use of the Buick to be a comparatively weak indicator of Schidecker and Lawler's involvement in drug-related activity.

{¶42} Unlike the other five factors relied on by Trooper Prather, we find that the sixth and seventh factors—the discrepancy between Schidecker and Lawler's explanation for driving the Buick and the owner's statement that Lawler was supposed to use the vehicle to drive to the store and Trooper Prather's belief that Schidecker and Lawler did not need to be in Marysville to go to the store—are modest, though not especially strong, indicators of additional criminal activity. To be sure, inconsistent stories or explanations, including those concerning travel plans, frequently factor into a court's conclusion that reasonable suspicion existed to prolong a traffic stop. *E.g.*, *State v. Balanik*, 11th Dist. Lake No. 2015-L-112, 2016-Ohio-3511, ¶ 27; *Alexander-Lindsey*, 2016-Ohio-3033, at ¶ 35; *Stephenson*, 2015-Ohio-233, at ¶ 23; *United States v. Hill*, 195 F.3d 258, 272 (6th Cir.1999). However,

these cases typically involve situations in which one of the occupants of a vehicle gives a statement that conflicts with another occupant's statement or in which an occupant changes her story during the course of the traffic stop. *E.g.*, *Balanik* at ¶ 27; *Alexander-Lindsey* at ¶ 35; *United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir.2012); *United States v. Figueroa-Espana*, 511 F.3d 696, 702-703 (7th Cir.2007); *Hill* at 272.

{¶43} In this case, as far as can be ascertained from the record, Schidecker and Lawler both claimed that they were using the Buick so that they could babysit. In addition, since Trooper Prather did not return to the Buick until the drug-detection dog arrived, Schidecker and Lawler's story remained constant throughout the time that the stop was prolonged. Logically, it is possible both that Schidecker and Lawler were being truthful about their travel plans and that the owner of the Buick had permitted Lawler to drive the vehicle only to the store. Moreover, it is possible that the store that Lawler was permitted to drive to was a Marysville-specific store. Because Trooper Prather did not conduct any additional investigation that could have shed light on whether Schidecker and Lawler were lying about their travel plans or whether they were simply operating the Buick even further outside of the scope of the owner's authorization, Schidecker and Lawler's explanation of their travel plans lacks any clear "indicia of * * * untruthfulness." *Townsend*, 305 F.3d at 543. Therefore, although the sixth and seventh factors are the strongest of the

factors relied on by Trooper Prather, they are still only moderately suggestive of criminal activity beyond the potential unauthorized use of the Buick.

{¶44} Finally, we observe that the traffic stop lacked stronger indicators of criminal activity that often accompany and bolster weaker indicators of criminal activity such as those relied on by Trooper Prather. For example, although Trooper Prather testified that he was trained to associate displays of conspicuous or abnormal nervousness, such as "someone's pulse beating heavily in their neck," pupil dilation, or out-of-place sweating, with possible criminality, he did not observe Schidecker or Lawler exhibiting any of these indicators of heightened nervousness. (*See* July 17, 2019 Tr. at 18-19). The only potentially unusual behaviors Trooper Prather observed were those that made up the first, second, and third factors, discussed above, and these behaviors are far less striking than the physiological reactions Trooper Prather referenced in his testimony. *See United States v. Simpson*, 609 F.3d 1140, 1148 (10th Cir.2010) (noting that "[e]xtreme and persistent nervousness * * * 'is entitled to somewhat more weight'" than normal nervousness), quoting *United States v. West*, 219 F.3d 1171, 1179 (10th Cir.2000).

{¶45} In addition, with the possible exception of Schidecker's suspended license, there is no evidence that Schidecker or Lawler had a previous criminal history at the time of the traffic stop, drug related or otherwise, or that Trooper Prather learned of any such history during the course of the stop. *See United States*

*v. Calvetti*, 836 F.3d 654, 667 (6th Cir.2016) (noting that a person's relevant criminal history is entitled to significant weight in the reasonable suspicion analysis); *United States v. White*, 584 F.3d 935, 951 (10th Cir.2009) ("'[I]n conjunction with other factors, criminal history *contributes powerfully to the reasonable suspicion calculus.*'") (Emphasis sic.), quoting *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir.2005). Furthermore, there is no evidence that Schidecker or Lawler disclosed bizarre, implausible, or contradictory travel plans to Trooper Prather or that they were traveling along a known "drug corridor." *See United States v. Santillan*, 902 F.3d 49, 57-58 (2d Cir.2018) (noting that "reasonable suspicion may be based, at least in part, on * * * an implausible explanation of the purpose of a trip" and collecting cases); *Calvetti* at 667 (noting that the Sixth Circuit had previously "'placed weight on implausible travel plans in considering whether reasonable suspicion has arisen,' such as when inconsistent explanations are offered"), quoting *Stepp*, 680 F.3d at 666. Lastly, there was no testimony that Trooper Prather saw any items commonly linked to drugs or drug trafficking, such as multiple air fresheners or numerous cell phones, in plain view in the Buick. *See United States v. Cardoza*, 713 F.3d 656, 660 (D.C. Cir.2013) (noting that the defendant's possession of three disposable cell phones when he was arrested increased the likelihood that he was involved in drug trafficking activity); *Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, at ¶ 19 (noting that "a vehicle smelling of

deodorizer" was a factor properly contributing to the trooper's development of reasonable suspicion).

{¶46} Again, we acknowledge that in considering whether Trooper Prather had a reasonable, articulable suspicion to justify extending the traffic stop, we must consider the totality of the circumstances. Nonetheless, while Trooper Prather relied on factors that we regard as "valid considerations in forming reasonable suspicion, they are all relatively minor and, in many cases, are subject to significant qualification." *Townsend*, 305 F.3d at 545. Moreover, this case lacks many of the stronger indicators of drug-related activity that frequently accompany and cast a suspicious light on otherwise weaker indicators of drug-related activity. *See id.*; *Stepp* at 667; *State v. Davenport*, 9th Dist. Lorain No. 11CA010136, 2012-Ohio-4427, ¶ 10. The weaker indicators of drug-related activity cited by Trooper Prather, even when combined, do not support a conclusion that Trooper Prather had a reasonable, articulable suspicion that Schidecker and Lawler were engaged in drug-related activity. *Johnson*, 482 Fed.Appx. at 148. As a result, we concur with the trial court that Trooper Prather was not justified in prolonging the traffic stop to allow for the arrival of the drug-detection dog. Accordingly, because Trooper Prather unreasonably prolonged the traffic stop, we conclude that the trial court did not err by granting Lawler's motion to suppress.

{¶47} The State's assignment of error is overruled.

**{¶48}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and ZIMMERMAN, J., concur.**

**/jlr**