[Cite as *State v. Mayo*, 2023-Ohio-124.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  1-22-28

      v.

JAVIN T. MAYO,                     O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No.  CR2021 0016

Judgment Affirmed

Date of Decision:  January 17, 2023

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Jana E. Emerick*  for Appellee

**MILLER, P.J.**

{¶1} Defendant-appellant, Javin T. Mayo, appeals the October 4, 2021 judgment of the Allen County Court of Common Pleas denying his motions to suppress evidence. For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} On January 15, 2021, in the city of Lima, Patrolman Riley Brubaker of the Lima Police Department stopped Mayo's vehicle after observing Mayo commit what Patrolman Brubaker believed to be a traffic infraction. During the stop, a drug-detection dog named Gemma was led around the exterior of Mayo's vehicle. Gemma performed an "open-air sniff" of the area surrounding Mayo's vehicle, and Gemma alerted to the presence of drugs in Mayo's vehicle. Based on Gemma's alert, Patrolman Brubaker searched Mayo's vehicle and found a loaded handgun.

{¶3} On March 12, 2021, the Allen County Grand Jury indicted Mayo on three counts: Count One of carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a fourth-degree felony; Count Two of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and Count Three of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a fourth-degree felony. On March 19, 2021, Mayo appeared for arraignment and pleaded not guilty to the counts of the indictment.

{¶4} On April 7, 2021, Mayo filed two motions to suppress the evidence obtained during the search of his vehicle. Mayo argued that Patrolman Brubaker had neither probable cause nor reasonable suspicion to stop his vehicle. Mayo also argued that using Gemma to sniff the air surrounding his vehicle was itself a search unsupported by probable cause and that, even if Gemma's sniff was not a search, Gemma's alert did not give Patrolman Brubaker probable cause to search.

{¶5} A suppression hearing was held on September 27, 2021. At the hearing, Patrolman Brubaker testified that at approximately 2:30 a.m. on January 15, 2021, he was on patrol in Lima in the area of South Shore Drive and McDonel Street when a vehicle traveling north on McDonel Street caught his attention. (Sept. 27, 2021 Tr. at 4-5). It was undisputed at the hearing that Mayo was the driver of the vehicle. According to Patrolman Brubaker, Mayo's vehicle turned left from McDonel Street onto Ohio Street, at which point Patrolman Brubaker lost sight of it. (Sept. 27, 2021 Tr. at 5). Patrolman Brubaker testified that he had to drive along several interconnected side streets to locate Mayo's vehicle. (Sept. 27, 2021 Tr. at 5). Patrolman Brubaker stated that when he eventually located Mayo's vehicle, it was still traveling west along Ohio Street. (Sept. 27, 2021 Tr. at 5). Patrolman Brubaker testified that he then got behind the vehicle and began to follow it. (Sept. 27, 2021 Tr. at 5).

**{¶6}** According to Patrolman Brubaker, "the vehicle immediately signaled to make a left hand turn onto Metcalf." (Sept. 27, 2021 Tr. at 5). Patrolman Brubaker testified that Mayo's vehicle completed the left turn onto Metcalf Street and began traveling south. (Sept. 27, 2021 Tr. at 6). Patrolman Brubaker stated that he followed the vehicle onto Metcalf Street, at which point the vehicle almost immediately turned left onto Ontario Street. (Sept. 27, 2021 Tr. at 6). He testified that Mayo's vehicle immediately proceeded to "get off" on the right side of Ontario Street without activating its right turn signal. (Sept. 27, 2021 Tr. at 6). Patrolman Brubaker stated that he then activated his overhead lights to initiate a traffic stop. (Sept. 27, 2021 Tr. at 6).

**{¶7}** The footage from Patrolman Brubaker's dashboard camera, which was admitted as an exhibit at the suppression hearing, was consistent with Patrolman Brubaker's account. (*See* Ex. 1). The recording depicts Mayo's vehicle heading in a westerly direction on Ohio Street. The vehicle is stopped at a stop sign with its left turn signal activated, waiting to turn left onto Metcalf Street. The vehicle then turns left onto Metcalf Street. After completing the left turn onto Metcalf Street, the vehicle briefly falls out of frame. When Mayo's vehicle reappears, its left turn signal has been reactivated. Mayo's vehicle then turns left onto Ontario Street and begins driving in an easterly direction on Ontario Street for a short distance. For approximately two seconds, Mayo's vehicle travels in the far-right side of Ontario

Street's right lane of travel. When Patrolman Brubaker pulls up behind Mayo's vehicle, Mayo's vehicle has come to a stop at the extreme right edge of Ontario Street. At this time, the vehicle's left turn signal is still blinking, though it is quickly deactivated. Patrolman Brubaker then turns on his overhead lights and initiates the traffic stop.

{¶8} Patrolman Brubaker testified that he stopped Mayo's vehicle "primarily for seeing that the turn signal was not operated to go off to the right side of the road." (Sept. 27, 2021 Tr. at 6). Indeed, in footage from Patrolman Brubaker's body-worn camera, which was also admitted as an exhibit, Patrolman Brubaker can be heard telling Mayo that he stopped his vehicle for failing to use his right turn signal before moving to the right side of Ontario Street to park. (*See* Ex. 1). Patrolman Brubaker issued a traffic "warning tag" to Mayo, a copy of which was admitted at the suppression hearing. (*See* Ex. 3). The warning tag indicated that Mayo had violated Lima City Ordinance ("L.C.O.") Section 432.12(a), which provides that "[n]o person shall move a vehicle which is stopped, standing, or parked from a curb, curb-line, parking space, or edge of traversable roadway unless such movement is made with reasonable safety and with the proper signal for movement." In the warning tag, Patrolman Brubaker described L.C.O. Section 432.12(a) as relating to "Starting and Backing From Curb." (Ex. 3). Furthermore,

in the "Comments" section of the warning tag, Patrolman Brubaker indicated that "Javin Mayo was issued a warning tag for failing to signal to the curb." (Ex. 3).

**{¶9}** With respect to Gemma's open-air sniff, Patrolman Brubaker testified that he requested the assistance of a canine unit after Mayo declined to consent to a search of his vehicle. (Sept. 27, 2021 Tr. at 9). Patrolman Brubaker stated that he was inside of his patrol vehicle filling out Mayo's warning tag when the canine unit arrived and that he had not yet completed the warning tag. (Sept. 27, 2021 Tr. at 9-10). Finally, Patrolman Brubaker testified that Gemma "conducted an open-air sniff around the vehicle, which the dog alerted to the odor of illegal narcotics coming from the vehicle, and at which time [he] proceeded back to the vehicle and informed [Mayo] to step out." (Sept. 27, 2021 Tr. at 9).

**{¶10}** On cross-examination, Patrolman Brubaker testified that Ontario Street is not marked with a centerline dividing the lanes of travel and that there are no "specially delineated" parking spaces. (Sept. 27, 2021 Tr. at 11). He stated that vehicles are permitted to park on either side of Ontario Street. (Sept. 27, 2021 Tr. at 12). Patrolman Brubaker testified that although Ontario Street is "more narrow" than other streets in the area, two cars can travel along it even when cars are parked on both sides of the street. (Sept. 27, 2021 Tr. at 12).

**{¶11}** Detective Breanna Kill, who was a canine handler for the Allen County Sheriff's Office on January 15, 2021, testified that she and Gemma were

called to the scene of Mayo's traffic stop. (Sept. 27, 2021 Tr. at 16-17). She testified that she had worked as a canine handler for approximately one year and that she was responsible for Gemma. (Sept. 27, 2021 Tr. at 16). Detective Kill stated that she and Gemma "had to go through training together, six weeks' worth of training" and that they "had to be certified at the end of that training to be able to even go on the street and work together." (Sept. 27, 2021 Tr. at 16). She testified that she and Gemma were properly certified and that they had to renew their certification every year. (Sept. 27, 2021 Tr. at 16). A copy of Detective Kill and Gemma's certification, which was admitted as an exhibit at the hearing, indicated that Detective Kill and Gemma had completed the "Special Purpose Canine Unit Evaluation" for "cocaine, heroin, methamphetamines and their derivatives." (Ex. 2).

**{¶12}** Detective Kill testified that after she and Gemma arrived at the traffic stop, she instructed Gemma to begin her sniff around Mayo's vehicle. (Sept. 27, 2021 Tr. at 18). According to Detective Kill, when Gemma got to the driver's side door, she sat, which indicated to Detective Kill that Gemma had detected the odor of narcotics. (Sept. 27, 2021 Tr. at 18-19). Detective Kill stated that she informed Patrolman Brubaker about the alert and returned Gemma to her patrol vehicle. (Sept. 27, 2021 Tr. at 19). Detective Kill was not involved in the search of Mayo's vehicle. (Sept. 27, 2021 Tr. at 20).

**{¶13}** On cross-examination, Detective Kill testified that Gemma's alert was ultimately classified as "unsubstantiated" because although marijuana was found during the subsequent search, Gemma was not certified to detect marijuana and none of the drugs Gemma was certified to detect were located. (Sept. 27, 2021 Tr. at 20-21). Detective Kill stated that she did not know when Gemma was first trained because Gemma was trained before they started working together. (Sept. 27, 2021 Tr. at 21-22). She testified that Gemma was never trained to detect marijuana because the person who trains canines for the Allen County Sheriff's Office does not "train on marijuana." (Sept. 27, 2021 Tr. at 22). Detective Kill testified that she did not know which cocaine, heroin, and methamphetamine derivatives were used in training Gemma. (Sept. 27, 2021 Tr. at 23). She further testified that control narcotics, including marijuana, were used in training to ensure that Gemma was not returning "false positives" for the substances she was certified to detect. (Sept. 27, 2021 Tr. at 23).

**{¶14}** Mayo's counsel's cross-examination of Detective Kill concluded with the following line of questioning:

[Counsel]: Okay. Okay. And [Gemma's] successfully not hit on the THC?

[Detective Kill]: Correct.

[Counsel]:          Okay.    What about any sort of prescription medications that would be in the opiate or amphetamine family?

[Detective Kill]:   I have not used those personally with [Gemma].

[Counsel]:          To your knowledge, will [Gemma] hit then on a prescription opiate or a prescription amphetamine?

[Detective Kill]:   To my knowledge – well, I guess specifically what are you thinking of?  Like an example?

[Counsel]:          Oh, Percocet, Vicodin, Sudafed strangely, or any kind of prescription medications that would be of those family of drugs.

[Detective Kill]:   Uh-huh; yes.

[Counsel]:          She will alert to those?

[Detective Kill]:   Yes.

[Counsel]:          Okay.  Have you personally had occasion where there's been an alert to a prescription medication?

[Detective Kill]:   Yes.

[Counsel]:          Okay.  How often?

[Detective Kill]:   I don't know a number exactly.  It just depends – a case by case basis.

[Counsel]:          Okay.  Have some of those alerts to prescription medications involved legally possessed prescription medications?

[Detective Kill]:      Yea.

[Counsel]:            Okay.  On multiple occasions?

[Detective Kill]:      Maybe two.

[Counsel]:            Okay.  On those occasions were there also illegal substances present?

[Detective Kill]:      No, there weren't.

[Counsel]:            Okay.  So Gemma will – you would agree that Gemma is trained so as to alert to substances that are not contraband that a person has the right to possess?

[Detective Kill]:      Yes.

(Sept. 27, 2021 Tr. at 23-25).

{¶15} Thereafter, during its closing statement, the State conceded that L.C.O. Section 432.12(a) "does not cover the conduct that [Mayo] showed."  (Sept. 27, 2021 Tr. at 26).  The State maintained that Mayo's conduct was "more aptly" a violation of L.C.O. Section 432.13, which provides both that "[n]o person shall turn a vehicle or move right or left upon a highway unless and until the person has exercised due care to ascertain that the movement can be made with reasonable safety, nor without giving an appropriate signal" and that "[w]hen required, a signal of intention to turn or move right or left shall be given continuously during not less

-10-

than the last 100 feet traveled by the vehicle before turning." L.C.O. Section 432.13(a)(1) and (2). The State thus argued that notwithstanding Patrolman Brubaker's mistaken reference to L.C.O. Section 432.12(a) in Mayo's warning tag, Patrolman Brubaker had reasonable suspicion to stop Mayo's vehicle. The State also maintained that Gemma's alert was sufficient to give Patrolman Brubaker probable cause to search Mayo's vehicle.

{¶16} In response, Mayo's counsel argued that there was no testimony from Patrolman Brubaker that "he made a reasonable mistake specifically and what his reasonings were for that. So, we can't say whether or not this was a reasonable mistake or not a reasonable mistake." (Sept. 27, 2021 Tr. at 27). He further claimed that Mayo could not have violated any statute or ordinance requiring him to signal right to the curb because he "turned left directly into a parking spot" and "hadn't straightened out" yet. (Sept. 27, 2021 Tr. at 28). He contended that "[t]here never was any rightward movement, nor could there have been." (Sept. 27, 2021 Tr. at 28). With respect to the probable cause generated by Gemma's alert, Mayo's counsel argued that the particular open-air sniff conducted by Gemma was itself a search because "the United States Supreme Court says that running a dog around a vehicle is not a search when the dog will not reveal the presence of contraband" but Detective Kill testified that Gemma "does and has in the past alerted to the presence

of items that people do, in fact, have a legal right to possess—prescription drugs with a legal prescription." (Sept. 27, 2021 Tr. at 29-30).

**{¶17}** On October 4, 2021, the trial court denied Mayo's suppression motions. The trial court concluded that Mayo could not have violated L.C.O. Section 432.12 and that "Patrolman Brubaker's belief that [Mayo's] movement to the right to park his vehicle violated [L.C.O. Section 432.12(a)] was a mistake of law." However, the trial court held that Patrolman Brubaker's mistake "was an objectively reasonable mistake of law in this case," and it suggested that Patrolman Brubaker had reasonable suspicion that Mayo had violated L.C.O. Section 432.13 when he stopped Mayo's vehicle. Thus, the "reasonable mistake of law" to which the trial court was referring was apparently Patrolman Brubaker's erroneous reference to L.C.O. Section 432.12(a), rather than to L.C.O. Section 432.13, in Mayo's warning tag. In addition, the trial court concluded that Gemma was sufficiently reliable and that her alert therefore gave Patrolman Brubaker probable cause to search Mayo's vehicle.

**{¶18}** On February 15, 2022, a change-of-plea hearing was held before the trial court. At the hearing, Mayo withdrew his previous not guilty pleas and pleaded no contest to the three counts of the indictment. The trial court accepted Mayo's no-contest pleas, found him guilty, and continued the matter for the preparation of a presentence investigation report. A sentencing hearing was held on March 24,

2022, at which the trial court sentenced Mayo to 18 months in prison on Count One, 24 months in prison on Count Two, and 18 months in prison on Count Three. The trial court ordered that these terms be served concurrently for an aggregate term of 24 months in prison. The trial court filed its judgment entry of sentence on March 24, 2022.

## II. Assignments of Error

{¶19} On April 21, 2022, Mayo timely filed a notice of appeal. He raises the following two assignments of error for our review:

> **1. The trial court erred in denying the defense motion to suppress the fruits of an unlawful stop of Mr. Mayo in a vehicle.**
>
> **2. The trial court erred in denying the defense motion to suppress the fruits of the search of Mr. Mayo's vehicle in this case.**

As they concern related issues, we consider Mayo's assignments of error together.

## III. Discussion

{¶20} In his assignments of error, Mayo argues that the trial court erred by denying his motions to suppress evidence.

### A. Suppression Motion Standard of Review

{¶21} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.*

*See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

**B. The trial court did not err by denying Mayo's motions to suppress evidence.**

{¶22} Mayo's challenge to the trial court's denial of his suppression motions is two-pronged. Mayo first argues that the trial court erred by concluding that Patrolman Brubaker had reasonable suspicion to stop his vehicle. Specifically, he contends that Patrolman Brubaker did not make an objectively reasonable mistake of law and that Patrolman Brubaker did not have probable cause to believe, or even a reasonable suspicion, that he had violated L.C.O. Section 432.13. Next, Mayo argues that the trial court erred by concluding that Patrolman Brubaker had probable cause to search his vehicle based on Gemma's alert. Mayo maintains that Gemma's open-air sniff was a search that could have proceeded only upon probable cause and that, regardless of whether Gemma's sniff was itself a search, Gemma's alert was insufficient to give Patrolman Brubaker probable cause to search. We address each of Mayo's arguments in turn.

**i. Patrolman Brubaker had reasonable suspicion to stop Mayo's vehicle notwithstanding that he cited the wrong L.C.O. section in Mayo's warning tag.**

{¶23} In most instances, "the Ohio Constitution affords protections coextensive with the Fourth Amendment." *State v. Dunn*, 12th Dist. Madison No. CA2022-01-001, 2022-Ohio-4136, ¶ 18. "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7.

{¶24} "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996). Consequently, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. To effect a constitutionally reasonable traffic stop, a law enforcement officer usually must have at least "'a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime,' including a traffic violation." *State v. Moiduddin*, 3d Dist. Union No. 14-18-15, 2019-Ohio-3544, ¶ 11, quoting *Mays* at ¶ 7.

{¶25} "The level of suspicion required to meet the reasonable-suspicion standard 'is obviously less demanding than that for probable cause' and 'is considerably less than proof * * * by a preponderance of the evidence' but is

'something more than an "inchoate and unparticularized suspicion or 'hunch.'"'" *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, ¶ 20, quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868 (1968). To justify a seizure on the basis of reasonable suspicion, the law enforcement officer involved "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988), quoting *Terry* at 21.

{¶26} In denying Mayo's suppression motions, the trial court concluded that Patrolman Brubaker had made an objectively reasonable mistake of law when he cited L.C.O. Section 432.12(a) in Mayo's warning tag instead of L.C.O. Section 432.13. Although this certainly was a "mistake" within the meaning of the word, Patrolman Brubaker's mistake was not a "mistake of law" as that phrase is typically used. Ordinarily, a law enforcement officer commits a "mistake of law" when they reasonably, albeit incorrectly, believe that a statute or ordinance prohibits conduct that is not in fact prohibited. *See State v. Kirkpatrick*, 1st Dist. Hamilton Nos. C-160880, C-160881 and C-160882, 2017-Ohio-7629, ¶ 13-14 (although wide left turn did not violate R.C. 4511.36, which court found to be unambiguous, officer's belief that turn violated the statute was an objectively reasonable mistake of law in light of previous appellate decision suggesting such turns were prohibited); *State v.*

*Hill*, 5th Dist. Stark Nos. 2015 CA 00078 and 2015 CA 00079, 2016-Ohio-1510, ¶ 15-21 (stop of defendant's vehicle was constitutionally valid despite "the officer's imperfect interpretation of the Alliance stop-sign ordinance"). In such instances, the officer's objectively reasonable mistake of law "can constitute reasonable suspicion to justify a traffic stop." *Kirkpatrick* at ¶ 6, citing *Heien v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530 (2014).

**{¶27}** Here, Patrolman Brubaker's justification for the stop of Mayo's vehicle, i.e., Mayo's failure to activate his right turn signal to indicate his movement to the right side of Ontario Street to park, was clearly explained to Mayo on scene and also outlined in the comment section of Mayo's warning tag. Though Mayo's conduct cannot be squared with the prohibitions of L.C.O. Section 432.12(a), which unambiguously prohibits a *stationary* vehicle from moving *from* a "curb, curb-line, parking space, or edge of traversable roadway" without signaling, Mayo's conduct did potentially implicate L.C.O. Section 432.13. Thus, Patrolman Brubaker's mistake did not involve a misunderstanding as to the scope or meaning of L.C.O. Section 432.12(a) but rather apparent confusion as to which L.C.O. section applied to Mayo's conduct. Patrolman Brubaker's mistake was more in the nature of a clerical or charging error, which does not itself impair the legality of the stop of Mayo's vehicle. *See State v. Egnor*, 12th Dist. Warren No. CA2019-05-042, 2020-Ohio-327, ¶ 22 (explaining that "whether the officer cited the correct subsection of

-17-

the statute on the ticket is inconsequential to whether [he] had an objectively reasonable suspicion that a violation had occurred" because the officer observed the defendant make a turn that "the officer believed to be an improper turn * * * in violation of R.C. 4511.36"); *State v. Strassman*, 4th Dist. Athens No. 98 CA 10, 1998 WL 833592, *3 (Nov. 20, 1998), fn. 5 (concluding that although trooper cited the defendant under the wrong statute, trooper had reasonable suspicion to stop defendant's vehicle because the trooper observed the defendant violating the law by driving left of the centerline). Instead, the legality of Patrolman Brubaker's stop of Mayo's vehicle turns on whether Patrolman Brubaker had probable cause to believe, or adequate reason to suspect, that Mayo had violated L.C.O. Section 432.13.

{¶28} To reiterate, L.C.O. Section 432.13 provides that "[n]o person shall turn a vehicle or move right or left upon a highway unless and until the person has exercised due care to ascertain that the movement can be made with reasonable safety, nor without giving an appropriate signal" and that "[w]hen required, a signal of intention to turn or move right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning." L.C.O. Section 432.13(a)(1) and (2). "Highway" is defined broadly as "[t]he entire width between the boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular travel." L.C.O. Section 402.01(jjj).

{¶29} L.C.O. Section 432.13 is nearly identical to R.C. 4511.39 and to numerous other municipal ordinances modeled after R.C. 4511.39. Explaining the operation of R.C. 4511.39 following its amendment in 1975, the Legislative Service Commission ("L.S.C.") stated that R.C. 4511.39 "requires a signal to be given not only before making a right or left turn, but also before changing lanes, passing another vehicle, *or pulling into or out of a parking place*." (Emphasis added.). Courts have applied R.C. 4511.39 and like municipal ordinances consistently with the L.S.C.'s commentary, concluding that a law enforcement officer may lawfully stop a vehicle if the driver fails to activate their turn signal before moving to the side of a roadway to park. *State v. Rastbichler*, 2d Dist. Montgomery No. 25753, 2014-Ohio-628, ¶ 2 and 20 (defendant did not contest that he failed to activate his turn signal before pulling over to the curb to park, which supplied the officer with a "lawful basis upon which * * * [to] initiate a traffic stop"); *State v. Brunner*, 5th Dist. Stark No. 2007CA00285, 2008-Ohio-4519, ¶ 19 (where the "evidence was undisputed that appellant moved from his lane of travel to the curb [to park] without activating a turn signal," officer had reasonable suspicion to make a traffic stop). In addition, R.C. 4511.39 and similar ordinances have been construed as requiring that a signal be given as soon as reasonably possible where the driver has less than 100 feet in which to signal their leftward or rightward movement upon the roadway. *See State v. Acord*, 4th Dist. Ross No. 05CA2858, 2006-Ohio-1616, ¶ 20; *State v. Evans*,

9th Dist. Summit No. 19803, 2000 WL 727536, *3 (June 7, 2000) (finding that an ordinance's requirement that a driver exercise "due care" and make movements with "reasonable safety" obligated driver to use a turn signal even though less than 100 feet were available in which to signal); *State v. Howell*, 12th Dist. Clinton No. CA98-07-019, 1999 WL 126071, *2 (Feb. 22, 1999) (same with respect to R.C. 4511.39).

**{¶30}** Therefore, as he was driving around Lima on January 15, 2021, Mayo had an obligation under L.C.O. Section 432.13 to activate his turn signal whenever he intended to pull to the side of the road to park and to do so continuously during not less than the last 100 feet his vehicle traveled before moving to park or, if 100 feet were not available to him, as soon as reasonably possible. Here, Patrolman Brubaker observed Mayo's vehicle turn left onto Ontario Street, travel a very short distance along Ontario Street's rightmost side, and come to a rest there. It is undisputed that Mayo never activated his right turn signal before parking on Ontario Street. Based on these specific and articulable facts, Patrolman Brubaker had an objectively reasonable suspicion that Mayo had violated L.C.O. Section 432.13. Consequently, the stop of Mayo's vehicle was reasonable and, therefore, constitutionally permissible.

**{¶31}** Nevertheless, Mayo argues that Patrolman Brubaker could not have reasonably believed that he violated L.C.O. Section 432.13 because his "vehicle

came to a stop with the left turn signal still active," meaning that "the left turn onto Ontario and into the final resting spot in the parked location never involved any right turn." (Appellant's Brief at 9-10). Mayo maintains that he "turned left into the curb parking spot, not onto Ontario and *then* into the curb parking spot." (Emphasis sic.) (Appellant's Brief at 7). He claims it was impossible to commit the turn signal offense as alleged by the officer because "the left turn itself was not even completed until the car came to rest." (Appellant's Brief at 7).

{¶32} Thus, Mayo argues that the stop was unreasonable because he could not possibly have complied with L.C.O. Section 432.13 under the circumstances and because he never actually made any distinct rightward movement while driving on Ontario Street. Neither claim is persuasive. To begin, whether it would have been impossible for Mayo to comply with L.C.O. Section 432.13 is, in this case, immaterial to whether the stop of his vehicle was constitutionally permissible. Had he been charged with and prosecuted for violating L.C.O. Section 432.13, Mayo might have chosen to defend against the charge by claiming that compliance with the requirements of L.C.O. Section 432.13 was impossible under the circumstances. *See Acord*, 2006-Ohio-1616, at ¶ 10-12 (suggesting the availability of an impossibility defense for violations of a municipal ordinance similar to L.C.O. Section 432.13). Yet, the relevant question is not whether Mayo would have had a defense had he been charged with violating L.C.O. Section 432.13 but instead

whether Patrolman Brubaker had a reasonable suspicion that Mayo had violated the ordinance. *State v. Smith*, 10th Dist. Franklin No. 13AP-592, 2014-Ohio-712, ¶ 12. "An officer is not required to determine whether someone who has been observed committing a crime might have a legal defense to the charge." *Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, at ¶ 17. As long as the stopping officer had "'at least a minimal level of objective justification for making the stop,'" the stop is constitutionally reasonable irrespective of whether the defendant would have had a successful defense to the underlying violation. *Acord* at ¶ 15, quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673 (2000). As explained above, Patrolman Brubaker's observations of Mayo's conduct supplied Patrolman Brubaker with the "minimal level of objective justification" necessary to lawfully stop Mayo's vehicle.

{¶33} Mayo's other argument—that Patrolman Brubaker could not have reasonably suspected that he violated L.C.O. Section 432.13 because he never actually turned or moved right on Ontario Street—fails for similar reasons. Mayo's argument raises interesting questions about the scope and application of L.C.O. Section 432.13. But again, the nuanced issues presented in Mayo's argument go more to whether Mayo was factually guilty of violating L.C.O. Section 432.13 rather than to whether Patrolman Brubaker had sufficient reason to believe that he had. Had Mayo been prosecuted for violating L.C.O. Section 432.13, a court, considering the evidence in view of Mayo's arguments, might have found him not

guilty. However, "'[t]hat the state may fail to prove an offense by proof beyond a reasonable doubt does not mean that the much lower standard of [reasonable suspicion] did not exist to support the offense in the first instance.'" *State v. Leder*, 12th Dist. Clermont No. CA2018-10-072, 2019-Ohio-2866, ¶ 26, quoting *State v. Mansour*, 12th Dist. Warren No. CA2015-06-051, 2016-Ohio-755, ¶ 26. "The fact that a defendant could not ultimately be convicted of failure to obey a traffic [law] is not determinative of whether an officer acted reasonably in stopping him for [the] offense." *State v. Cronin*, 1st Dist. Hamilton No. C-100266, 2011-Ohio-1479, ¶ 12. Indeed, the stopping officer need not "correctly predict that a conviction will result." *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 15.

**{¶34}** Here, having reviewed Patrolman Brubaker's testimony and the footage from his patrol vehicle's dashboard camera, we cannot conclude that Mayo's conduct was so clearly compliant with L.C.O. Section 432.13 as to render unreasonable Patrolman Brubaker's belief that Mayo had violated the ordinance. Mayo entered Ontario Street from Metcalf Street and drove eastward along the outer right side of Ontario Street for approximately two seconds before coming to rest at the rightmost edge of the roadway. Faced with these facts, an objective law enforcement officer could reasonably conclude that L.C.O. Section 432.13 mandated that Mayo activate his right turn signal at some time before his vehicle came to a stop. Under the circumstances present here, the possibility that Mayo's

conduct might not in actuality have been violative of L.C.O. Section 432.13 does not negate Patrolman Brubaker's reasonable suspicion. That is, even if Mayo did not in fact violate L.C.O. Section 432.13 and Patrolman Brubaker was mistaken in believing that he had, Patrolman Brubaker's understanding of the law and his application of the law to the facts with which he was confronted were eminently reasonable, thus supporting a reasonable suspicion to stop Mayo's vehicle. *See State v. Spellacy*, 8th Dist. Cuyahoga No. 106909, 2019-Ohio-785, ¶ 31-35; *State v. Fickert*, 2d Dist. Clark No. 2018-CA-15, 2018-Ohio-4349, ¶ 20-23.

**ii. Gemma's alert was sufficient to give Patrolman Brubaker probable cause to search Mayo's vehicle.**

{¶35} "[A] law enforcement officer is not constitutionally prohibited from conducting a canine sniff of a vehicle during the course of a lawful traffic stop." *State v. Lawler*, 3d Dist. Union No. 14-19-25, 2020-Ohio-849, ¶ 15. Generally, "[a]n exterior sniff of a vehicle by a trained drug-detection dog does not constitute a 'search' within the meaning of the United States Constitution or the Ohio Constitution." *Id.* "Consequently, a law enforcement officer may conduct a canine sniff of a vehicle without reasonable suspicion of additional illegal activity, provided that '"the officer conducts [the] canine sniff of the vehicle before the reasonable completion of the traffic stop procedures * * *."'" (Bracketing in original.) *Id.*, quoting *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-

-24-

Ohio-2586, ¶ 22, quoting *State v. Elliott*, 7th Dist. Mahoning No. 11 MA 182, 2012-Ohio-3350, ¶ 23.

**{¶36}** Mayo acknowledges the longstanding rule that an open-air sniff by a trained drug-detection canine conducted during a traffic stop is not treated as a search for Fourth Amendment purposes. He argues, however, that this rule has been perpetuated due to a widespread misunderstanding prevailing among the courts of Ohio and other jurisdictions. Mayo's position is based in substantial part on the United States Supreme Court's holding in *Illinois v. Caballes* that "[a] dog sniff conducted during a concededly lawful traffic stop *that reveals no information other than the location of a substance that no individual has any right to possess* does not violate the Fourth Amendment." (Emphasis added.) 543 U.S. 405, 410, 125 S.Ct. 834 (2005). Mayo also relies on the following passage from Justice Souter's dissent in *Caballes*:

> At the heart both of [*United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637 (1983)] and the Court's opinion today is the proposition that sniffs by a trained dog are *sui generis* because a reaction by the dog in going alert is a response to nothing but the presence of contraband. See *ibid.* ("[T]he sniff discloses only the presence or absence of narcotics, a contraband item"); *ante*, at 838 (assuming that "a canine sniff by a well-trained narcotics-detection dog" will only reveal "'the presence or absence of narcotics, a contraband item'" (quoting *Place*, *supra*, at 707, 103 S.Ct. 2637)). Hence, the argument goes, because the sniff can only reveal the presence of items devoid of any legal use, the sniff "does not implicate legitimate privacy interests" and is not to be treated as a search. *Ante*, at 838.

(Footnote omitted.) *Id.* at 411 (Souter, J., dissenting).

{¶37} Mayo thus argues that "*Illinois v. Caballes* seems to require from the State a showing that the drug-detecting dog does not reveal anything except contraband." (Appellant's Brief at 12). He contends it is insufficient for the State to simply prove the dog was certified to detect illegal drugs but that the State must also establish the dog does not detect lawful items. In addition to *Caballes*, Mayo also points to a decision from the Colorado Supreme Court where the court, construing its own state constitution, found that an open-air sniff is a search under the Colorado Constitution if the drug-detection canine is trained to detect marijuana, which persons are permitted to possess under Colorado state law. *People v. McKnight*, 446 P.3d 397, 2019 CO 36, ¶ 48 (Colo.2019) ("Because a sniff from a dog trained to detect marijuana (in addition to other substances) can reveal lawful activity, we conclude that [such a] sniff is a search under article II, section 7 [of the Colorado Constitution] and must be justified by some degree of suspicion of criminal activity.").

{¶38} Whatever merit Mayo's argument might have in the abstract, it has no bearing here. First, even if Mayo is right that an open-air sniff by a canine trained to detect lawful substances is a search under the Fourth Amendment, an issue about which we offer no opinion at present, it is unclear why the State should have the burden of demonstrating that a particular sniff was not a search. The law in Ohio is clear that an open-air sniff by a properly trained drug-detection dog conducted

during a traffic stop *is not* a search for Fourth Amendment purposes. Further, as a general matter, when there is a question whether a challenged governmental action was a search under the Fourth Amendment, the *defendant* bears the burden of proof on the issue.[1] *See State v. Jordan*, 3d Dist. Union No. 14-21-21, 2022-Ohio-1992, ¶ 20-26.

**{¶39}** But more importantly, from the available record, it cannot be determined whether the new legal standard proposed by Mayo would even apply. Detective Kill testified that on two previous occasions when Gemma alerted, only legally possessed prescription drugs were found during the ensuing search. (Sept. 27, 2021 Tr. at 25). Detective Kill agreed that "Gemma is trained so as to alert to substances that are not contraband that a person has the right to possess." (Sept. 27, 2021 Tr. at 25). However, notwithstanding Detective Kill's representation, the fact that Gemma had alerted on occasions where only legally possessed prescription drugs were found is not synonymous with saying that Gemma was trained to detect these drugs. Significantly, Detective Kill testified that she was unaware which cocaine, heroin, and methamphetamine derivatives were used in training Gemma. (Sept. 27, 2021 Tr. at 23). She further stated that prescription opiates or amphetamines had not been utilized in her training with Gemma. (Sept. 27, 2021

---

[1] Gemma's trainer was subpoenaed by Mayo to bring the dog's training records and to testify. Although the trainer appeared pursuant to the subpoena, the defense opted to present no testimony and he was excused after the State concluded its presentation of evidence.

Tr. at 23). Therefore, examining the totality of Detective Kill's testimony, it is not entirely clear whether Detective Kill was describing Gemma's tendency to alert to certain prescription drugs in accordance with her training or whether Detective Kill was conflating the discovery of prescription drugs during post-alert searches with Gemma being trained to detect those specific drugs. The latter interpretation potentially implicates Gemma's reliability rather than the scope of her training. *See Florida v. Harris*, 568 U.S. 237, 245-247, 133 S.Ct. 1050 (2013). Consequently, as the record does not conclusively support the application of Mayo's proposed rule even if we were to accept it, we will proceed under the customary standard—that Gemma's open-air sniff did not constitute a search for Fourth Amendment purposes because it did not implicate Mayo's legitimate privacy interests. *See Caballes*, 543 U.S. at 408-409.

{¶40} Having determined that Gemma's open-air sniff was not a search, we turn now to the final issue—whether Gemma's alert supplied Patrolman Brubaker with probable cause to search Mayo's vehicle. "A warrantless search of an automobile, where police officers have probable cause to believe such vehicle contains contraband, is one of the well-recognized exceptions to the constitutional requirement of a search warrant." *State v. James*, 5th Dist. Muskingum No. CT2015-0059, 2016-Ohio-7660, ¶ 23. As a general rule, if a drug-detection canine "'alerts to a drug odor on the outside of [a] vehicle, the police then have probable

cause to search the interior for contraband.'" *State v. Haley*, 3d Dist. Marion No. 9-22-04, 2022-Ohio-2188, ¶ 9, quoting *State v. Harris*, 12th Dist. Butler No. CA2007-04-089, 2008-Ohio-3380, ¶ 16.

**{¶41}** Mayo contends that Gemma's alert, standing alone, did not give Patrolman Brubaker probable cause to search his vehicle. Mayo argues that the existence of probable cause is determined by examining the totality of the circumstances, which, according to Mayo, the trial court failed to consider properly. In support of his argument, Mayo points to this court's decision in *State v. Wade*, 3d Dist. Seneca No. 13-16-23, 2017-Ohio-1319. In that case, Wade claimed that "the trial court should have suppressed the results of the search because the alert of [the drug-detection canine] alone was insufficient to provide probable cause for a search * * *." *Id.* at ¶ 14. Rejecting Wade's argument, we concluded: "Based upon the totality of the circumstances at that time, [the law enforcement officer] had probable cause to suspect that criminal activity was occurring and to continue to investigate. Contrary to the argument of Wade, the search was not based solely upon the alert of the [drug-detection canine], but upon all of the information available to the officer at the time." *Id.* at ¶ 16.

**{¶42}** Mayo asserts that, in *Wade*, this court changed "the general rule * * * that an alert by a canine was sufficient probable cause in and of itself to warrant a search." (Appellant's Brief at 16). But we did no such thing. Instead, we concluded

-29-

that there was probable cause to search based on the totality of the circumstances, but we offered no opinion as to whether the alert would have been independently sufficient to justify the search. In *Wade*, we merely applied the general rule that "[a] court must review the totality of the circumstances known to the officer at the time of the search to determine if the officer had probable cause to conduct the search," without in any way foreclosing that probable cause to search may be found based solely on the alert of a properly qualified drug-detection dog. *State v. Douglas*, 3d Dist. Marion No. 9-13-07, 2013-Ohio-4563, ¶ 34.

{¶43} Indeed, Mayo's claim that this court shifted its approach to dog-sniff cases in *Wade* is belied by our post-*Wade* case law. Since *Wade*, we have suggested that an alert from a trained drug-detection dog itself furnishes a law enforcement officer with probable cause to search a vehicle. *See Haley*, 2022-Ohio-2188, at ¶ 9; *State v. Womack*, 3d Dist. Auglaize No. 2-20-12, 2021-Ohio-98, ¶ 27-28. We have explained:

> "When a trained narcotics dog alerts to the odor of drugs from a lawfully detained vehicle, probable cause to search a vehicle and its contents exists." *State v. Fritz*, 12th Dist. Clermont No. CA2019-12-094, 2020-Ohio-5231, ¶ 29, citing *State v. Blatchford*, 12th Dist. Preble No. CA2015-12-023, 2016-Ohio-8456, ¶ 38 and *State v. Cruz*, 12th Dist. Preble No. CA2013-10-008, 2014-Ohio-4280, ¶ 18. "Regarding the reliability of a canine search, the United States Supreme Court has held that '[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.'" [*Fritz* at ¶ 29], quoting [*Harris*, 568 U.S. at 246-247].

*Womack* at ¶ 27. Our position accords with United States Supreme Court precedent and with the rule followed by our sister courts of appeals. *See, e.g.*, *Harris* at 246, fn. 2 ("[A] well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime * * * will be found."); *State v. Johns*, 5th Dist. Licking No. 19-CA-5, 2019-Ohio-4269, ¶ 13 ("[I]f a trained narcotics dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband."); *State v. Brooks*, 9th Dist. Summit No. 28070, 2016-Ohio-7025, ¶ 14 ("[I]f a trained narcotics dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search inside of that vehicle for contraband."). Lest any confusion persist, we take this opportunity to reiterate that, in the typical case, probable cause to search a vehicle may be based solely on the alert of a trained drug-detection dog.

{¶44} In this case, at the September 27, 2021 suppression hearing, the State presented testimony and documentary evidence establishing that the "Ohio Peace Officer Training Commission & the Office of the Attorney General" had certified that Gemma had completed the "Special Purpose Canine Unit Evaluation" with respect to the detection of "cocaine, heroin, methamphetamines and their derivatives." (Sept. 27, 2021 Tr. at 16); (Ex. 2). "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris* at 246. Consequently, as Gemma's reliability was

certified by entities whose bona fides Mayo does not challenge, it can be presumed that Gemma's alert provided Patrolman Brubaker with probable cause to search. *Id.* at 246-247.

**{¶45}** We recognize that Gemma's alert was "unsubstantiated" insofar as the only illegal substance discovered during the ensuing search was marijuana, which Gemma was not certified to detect. We also acknowledge Detective Kill's testimony to the extent it might be construed as indicating that Gemma had previously alerted to drugs she was not certified to detect. However, as the United States Supreme Court explained in *Harris*, a "false positive" does little to undermine Gemma's overall reliability:

> [I]n most cases [records of a dog's field performance] have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely * * *, if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

(Footnotes omitted.) *Id.* at 245-246.

{¶46} Here, Mayo did not contest the adequacy of Gemma's training program or examine how Gemma and Detective Kill performed during the assessments preceding their certification. *See Harris*, 568 U.S. at 247. Nor did Mayo point to anything in the circumstances surrounding Gemma's alert at his vehicle that would negate a finding of probable cause notwithstanding Gemma's general dependability. *See id.* Accordingly, to the extent that the record discloses "false positives" on Gemma's part, we cannot say that they are sufficient to undermine Gemma's reliability or the probable cause generated by her alert. Therefore, we conclude that based on Gemma's alert, Patrolman Brubaker had probable cause to search Mayo's vehicle and that the search of Mayo's vehicle was thus constitutionally permissible.

{¶47} Mayo's first and second assignments of error are overruled.

### IV. Conclusion

{¶48} For the foregoing reasons, Mayo's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed*

**SHAW and ZIMMERMAN, J.J., concur.**

**/jlr**