[Cite as *State v. Frisbie*, 2023-Ohio-881.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                        CASE NO. 5-22-15

      v.

CASEY A. FRISBIE,                           O P I N I O N

      DEFENDANT-APPELLANT.

---

Appeals from Hancock County Common Pleas Court
Trial Court Nos. 2021 CR 167 and 2021 CR 475

Judgments Affirmed

Date of Decision: March 20, 2023

---

APPEARANCES:

      *William T. Cramer* for Appellant

      *Phillip A. Riegle* for Appellee

**WALDICK, J.**

{¶1} This is a consolidated appeal in which the defendant-appellant, Casey Frisbie ("Frisbie"), appeals the judgments of conviction entered against him in two cases in the Hancock County Court of Common Pleas. Specifically, Frisbie assigns error with the trial court's decisions denying motions to suppress evidence filed by Frisbie in those cases.

*Procedural History*

{¶2} In Case Number 5-22-15 (2021 CR 167), an indictment was returned against Frisbie on May 18, 2021. In the sole count of that indictment, Frisbie was charged with Possession of Cocaine, a first-degree felony in violation of R.C. 2925.11(A). On May 21, 2021, an arraignment was held and Frisbie entered a plea of not guilty. On June 25, 2021, Frisbie filed a motion to suppress, upon which an evidentiary hearing was held on August 17, 2021. On September 22, 2021, the trial court filed a judgment entry overruling the motion to suppress.

{¶3} In Case Number 5-22-16 (2021 CR 475), a two-count indictment was returned against Frisbie on November 30, 2021. Count 1 of that indictment charged Frisbie with Possession of a Fentanyl-Related Compound, a first-degree felony in violation of R.C. 2925.11(A). Count 2 of that indictment charged Frisbie with Aggravated Possession of Drugs (Methamphetamine), a first-degree felony in violation of R.C. 2925.11(A). On January 5, 2022, an arraignment was held and

Frisbie entered a plea of not guilty to the indictment. On January 14, 2022, Frisbie filed a motion to suppress in that case, upon which an evidentiary hearing was held on February 8, 2022. At the close of the hearing, the trial court overruled the motion from the bench, a decision that was subsequently journalized on June 22, 2022.

{¶4} On January 21, 2022, the prosecution moved to join the two cases for trial, a motion that was granted by the trial court on January 28, 2022.

{¶5} On June 21, 2022, a jury trial was scheduled to begin in the two cases. However, before jury selection could commence, the trial court was notified by defense counsel that Frisbie wished to accept a negotiated plea offer previously extended by the state. Frisbie then pled no contest to an amended indictment in 2021 CR 167, with that indictment amended to a charge of Possession of Cocaine, a third-degree felony. Frisbie also pled no contest to an amended indictment in 2021 CR 475, with Count 1 of that indictment amended to Possession of a Fentanyl-Related Compound, a third-degree felony, and Count 2 amended to Aggravated Possession of Drugs, also a third-degree felony. The trial court accepted Frisbie's pleas of no contest, and found Frisbie guilty of the amended charges in both cases.

{¶6} Later on that same date, a sentencing hearing was held in both cases. In 2021 CR 167, Frisbie was sentenced to the jointly-recommended prison term of thirty-six months. In 2021 CR 475, Frisbie was sentenced to the jointly-recommended prison term of thirty-six months on Count 1 and to the jointly-

-3-

recommended prison term of thirty-six months on Count 2. Pursuant to another joint recommendation of the parties, the trial court ordered that the two sentences in 2021 CR 475 were to be served consecutively to each other, as well as consecutively to the sentence in 2021 CR 167, and also consecutively to a 2020 felony case in which Frisbie had also been sentenced to prison.

{¶7} Frisbie thereafter filed a notice of appeal in each case. This court subsequently ordered that the two appeals be consolidated.

*Evidence Presented at the Suppression Hearings*

{¶8} At the suppression hearing held on August 17, 2021, the prosecution presented the testimony of City of Findlay Police Department Dispatcher Candace Haskell, Patrolman Mason Warnimont, and Patrolman Ryan Hackworth, as well as introducing numerous physical exhibits that served to illustrate and corroborate much of the testimony.

{¶9} The testimony at that hearing can be summarized as follows: Shortly after midnight on May 8, 2021, the Findlay Police Department received a call on their regular phone line from a male who reported that, through a shared wall with the residence at 917 ½ North Main Street, he could hear his neighbors fighting. After the dispatcher asked some additional questions, the caller indicated that he could hear someone screaming and stomping around, and the caller reported that he had just heard what sounded like someone punching something. However, the caller

was uncertain as to how many persons might actually be present in the apartment at 917 ½ North Main Street.

{¶10} Based on that information, and because the Findlay Police Department had received two domestic violence calls in the prior week that related to that same address, Patrolmen Traxler and Walker were immediately dispatched to 917 ½ North Main Street with regard to a possible domestic violence situation in progress. Right after that, the police sergeant on duty requested that an additional officer be dispatched to assist Officers Traxler and Walker, due to the domestic violence history at that location. As Patrolman Hackworth and a trainee, Patrolman Warnimont, were near the address at issue, they were then also dispatched to 917 ½ North Main Street with regard to a possible domestic violence in progress.

{¶11} Officers Hackworth and Warnimont, who were on patrol duty together in one marked cruiser, were about a block away from 917 ½ North Main Street when they were dispatched to that location at 12:08 a.m. Patrolman Hackworth, a police officer since 2009, had been a patrolman with the Findlay Police Department for seven years. At that time, he was serving as a field training officer to Patrolman Warnimont, who was nearing the end of his initial 16-week training period with the department. On May 8, 2021, Warnimont was working in full uniform attire, clearly identifying him as a police officer, while Hackworth was in plainclothes, a training strategy used so that citizens interacting with the officers on calls would direct

attention to the trainee in uniform, and not the senior officer, thereby permitting Warnimont to gain more experience. On that date, both officers were aware that 917 ½ North Main Street was the residence of Casey Frisbie and Jenny Gary, a couple involved in an intimate relationship. On that date, both officers were also aware that the Findlay Police Department had responded just a few days earlier to a call from Jenny Gary reporting that Frisbie was trying to attack her with a knife.

{¶12} On May 8, 2021, Warnimont and Hackworth were the first officers to arrive at 917 ½ North Main Street in response to the dispatch. The apartment at 917 ½ North Main Street is a second-story apartment, the front door to which is reached by a narrow set of exterior stairs. Upon arriving at that address, Warnimont and Hackworth began walking single-file up the open stairway to the front door, with Warnimont in the lead. As they started up the stairs, the officers could hear angry-sounding yelling coming from the upstairs apartment. The officers could not initially make out exactly what was being said by whomever was yelling, but the officers heard profanities and it sounded as if items were being banged or thrown around inside the apartment. Then, while the officers were still climbing the stairs, about a third of the way up to the apartment's front door, they both heard someone from inside the apartment say, "Do you want punched in the face, Jenny?".

{¶13} Immediately thereafter, Frisbie exited the front door of his apartment and started down the stairs. Warnimont verbally identified himself as a police

officer and told Frisbie to stop. However, upon seeing the officers approaching up the stairway, Frisbie abruptly turned and ran back up the stairs. Frisbie failed to heed the officers' commands to stop and to not enter the apartment and, instead, Frisbie ran back into the apartment and slammed the front door behind him. Warnimont and Hackworth pursued Frisbie up the steps, got to the closed front door, and Warnimont then directed Frisbie multiple times to open the door, but Frisbie failed to do so. Patrolman Hackworth then advised Patrolman Warnimont that exigent circumstances existed that would permit forced entry to the apartment, and so Warnimont kicked in the front door. While Warnimont was initially trying to force open the door, it felt to him as if something was obstructing the door on the inside, and it took Warnimont three kicks to get the door open.

{¶14} Patrolman Warnimont entered the apartment with his taser drawn, with Patrolman Hackworth following behind. Upon entering the apartment, the officers saw Frisbie coming around from the far side of a refrigerator that was located in the living room next to the front door. Frisbie was instructed to get on the floor, face down, and Frisbie complied. Another officer had arrived by that time and that officer handcuffed Frisbie, initially for safety reasons and investigative purposes, and then sat Frisbie down on the living room couch. Once Frisbie was temporarily detained in that fashion, Warnimont and Hackworth then quickly searched the apartment for anyone else who might be there and who may have been

hurt. No victim or any other individuals were located during that protective sweep, which took two minutes or less. Warnimont then asked Frisbie where Jenny Gary was, and Frisbie advised that he had been speaking to Jenny on the phone and that they had been arguing.

{¶15} By the time Officers Warnimont and Hackworth were done checking the apartment for a potential domestic violence victim, two sergeants had also arrived at the scene but remained outside. Warnimont and Hackworth went outside briefly to speak with a supervisor, to ask if Frisbie should be arrested for Obstructing Official Business and, if so, how to handle the bond. While Warnimont and Hackworth were outside, Officers Traxler and/or Walker remained in the apartment in order to watch Frisbie, who was still detained on the couch. Outside, a sergeant instructed Warnimont to charge Frisbie with Obstructing Official Business, but to issue an "OR" bond for the charge, in order to avoid transporting Frisbie to the county jail in light of the ongoing COVID-19 pandemic. Patrolman Warnimont grabbed the OR bond paperwork from his cruiser and returned to the residence, where Patrolman Hackworth was already waiting in the living room area, standing next to the full-sized refrigerator that was in that room, located next to the front door.

{¶16} Patrolman Warnimont began explaining to Frisbie that he was being charged with Obstructing Official Business but that he would be given an OR bond.

While Warnimont was explaining the bond to Frisbie, who was still on the living room couch, Hackworth then indicated that he had just noticed something behind the refrigerator. Warnimont went over to see what Hackworth was talking about and, at that time, Frisbie made the unsolicited statement, "That's not mine."

{¶17} The refrigerator in question was not sitting flush with the wall behind it but, rather, was several inches off that wall. With neither officer having touched or moved the refrigerator in any way, both Warnimont and Hackworth were able to plainly observe two sandwich-type bags of suspected drugs in the space behind the refrigerator, between the back of the refrigerator and the living room wall. Again, with no officer having moved the refrigerator in any way, Warnimont and Hackworth were able to see that the larger bag contained a white crystallized substance that both officers had reason to believe was crack cocaine, based on their training and prior professional experience. The smaller of the two bags, which was located closer to the floor than the bigger bag, contained a powdery substance that appeared to the officers to be either heroin or fentanyl.

{¶18} Based on those observations, and the fact that the suspected drugs were in plain view, Officer Hackworth then reached behind the refrigerator to collect the bags. Hackworth easily retrieved the larger bag but could not quite reach down to retrieve the smaller bag, which was somewhat wedged into place and was partially underneath some drywall debris. The officers noted that the smaller bag

was torn in one spot, and both officers were concerned about tearing the plastic further and spilling the contents if they were to forcibly tug the bag loose. This concern was based in part on the fact that the powdery substance in the smaller bag appeared likely to be fentanyl, which is a very potent and potentially lethal drug if it becomes airborne and is inhaled or if it makes direct contact with one's skin.

{¶19} In order to safely retrieve the smaller bag of drugs, the officers began to move the refrigerator slightly forward. Because the refrigerator was sitting on carpeting, the bottom of the refrigerator did not slide out when the officers attempted to move it forward. Instead, only the top portion of the refrigerator moved in response to the officers' efforts, resulting in the top portion of the refrigerator tipping slightly forward. When that happened, the top freezer door swung open and a small black safe fell out of the freezer onto the floor. The officers confirmed in their testimony that it was their movement of the refrigerator that had inadvertently caused the freezer door to swing open and the safe to then fall out. The safe had not previously been in plain view until that time.

{¶20} Once the two bags of suspected drugs had been retrieved from behind the refrigerator, the contents of the larger bag were immediately field tested and the test result was positive for the presumptive evidence of cocaine in that substance. The officers then advised Frisbie that he was under arrest for Possession of Cocaine, and Frisbie was removed from the apartment and transported to jail.

**{¶21}** At the second suppression hearing, which was held on February 8, 2022, the parties stipulated that all evidence presented at the first hearing would be incorporated by reference into evidence at the second hearing, to avoid excessive repetition. The prosecution then presented additional testimony from Patrolman Ryan Hackworth, as well as several additional photographic exhibits.

**{¶22}** Patrolman Hackworth's testimony at the second hearing touched upon his initial observation of the bags of drugs behind the refrigerator, and detailed the retrieval of the two bags, consistent with the testimony presented on those matters at the first hearing. Hackworth then also testified in detail about the safe that dropped out of the freezer compartment when the refrigerator was moved, his decision to ultimately seize that safe, and how an additional quantity of fentanyl and multiple bags of methamphetamine were subsequently discovered in the safe, pursuant to a search warrant. As all of that additional testimony given by Patrolman Hackworth related to matters not before this court on appeal, we have opted to not set it out here in great detail.

**{¶23}** As noted above, the trial court ultimately overruled both motions to suppress filed by Frisbie, and certain aspects of those decisions are now being assigned as error on appeal.

**Assignment of Error**

**APPELLANT'S RIGHTS TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURES UNDER THE U.S. AND OHIO CONSTITUTIONS WERE VIOLATED BY THE TRIAL COURT'S DENIALS OF APPELLANT'S MOTIONS TO SUPPRESS.**

**{¶24}** In the sole assignment of error, Frisbie argues that the trial court erred in overruling the motions to suppress physical evidence that had been seized by police from Frisbie's apartment on May 8, 2021.[1]

**{¶25}** In the motion to suppress filed in 2021 CR 167, at issue was the warrantless seizure of the large bag of cocaine found by police behind the refrigerator in Frisbie's living room. That cocaine was the basis of the possession charge in 2021 CR 167.

**{¶26}** In the motion to suppress filed in 2021 CR 475, at issue was the warrantless seizure of the bag of fentanyl found by police behind the refrigerator in Frisbie's living room and also the warrantless seizure of the safe that had been in Frisbie's freezer. Upon subsequently opening the safe pursuant to a search warrant, police found the safe to contain an additional quantity of fentanyl, along with several bags of methamphetamine. The fentanyl found behind the refrigerator and the fentanyl found in the safe combined to form the basis of the possession of fentanyl

---

[1] In the motion to suppress filed on 6/25/21 in 2021 CR 167, the defense additionally moved to suppress statements made by Frisbie to law enforcement, which the trial court also overruled. The trial court's ruling with regard to the statements is not challenged on appeal.

charge in Count 1 in 2021 CR 475, and the bags of methamphetamine found in the safe combined to form the basis of the aggravated possession of drugs charge in Count 2 in 2021 CR 475.[2]

{¶27} Frisbie's challenge to the trial court's denial of the suppression motions is multi-pronged. Frisbie first argues that the initial warrantless and forced entry into his apartment by police was not justified under the exigent circumstances exception to the search warrant requirement. Frisbie next argues that, even if the initial entry into his apartment was lawful, a warrantless re-entry by police into Frisbie's apartment was not justified once police knew that no one else was in the apartment. Third, Frisbie argues that the warrantless seizure of the two bags of drugs behind the refrigerator was not justified under the plain view exception to the search warrant requirement. We shall address each of these claims in turn.

*Standard of Review*

{¶28} As we recently stated in *State v. Mayo*, 3rd Dist. Allen No. 1-22-28, 2023-Ohio-124, at ¶ 21:

> **"Appellate review of a motion to suppress presents a mixed question of law and fact."** *State v. Burnside*, **100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position**

---

[2] On appeal, Frisbie takes issue with the warrantless discovery and seizure of the drugs behind the refrigerator. While Frisbie argued in the trial court that the warrantless discovery and seizure of the drug-filled safe should also be suppressed, Frisbie does not raise that claim on appeal. Additionally, it should be noted that Frisbie did not, and does not, challenge the validity of the search warrant pursuant to which law enforcement later opened the safe.

**to evaluate the evidence and the credibility of witnesses.** *Id.* *See State v. Carter*, **72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence."** *Burnside* **at ¶ 8, citing** *State v. Fanning*, **1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard.** *Id.*, **citing** *State v. McNamara*, **124 Ohio App.3d 706 (4th Dist.1997).**

*Analysis*

{¶29} "The Fourth Amendment to the United States Constitution guarantees that '[t]he right of the people to be secure in their persons * * * and effects, against unreasonable searches and seizures, shall not be violated.' A search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies. See *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)." *State v. Jackson*, ___ Ohio St.3d ___, 2022-Ohio-4365, ¶ 10. The Supreme Court of Ohio has held that "Article I, Section 14 of the Ohio Constitution affords the same protection as the Fourth Amendment in felony cases." *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, ¶ 12, citing *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 10, fn. 1.

{¶30} "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted.) This

presumption may be overcome in certain circumstances because "'the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kentucky v. King,* 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011), quoting *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). To overcome that presumption, the state bears the burden of demonstrating that the search falls within one of the exceptions to the warrant requirement. *State v. Kessler*, 53 Ohio St.2d 204, 207, 373 N.E.2d 1252, 1255 (1978) .

**{¶31}** In the instant case, Frisbie first argues that the trial court should have granted his motions to suppress because the officers impermissibly made a warrantless forced entry into Frisbie's apartment in the first place. The State of Ohio argues, and we agree, that the warrantless entry into the apartment was justified by the exigent circumstances exception to the general search warrant requirement.

**{¶32}** A well-recognized exception to the warrant requirement is where exigent circumstances or an emergency exists, which is sometimes also referred to as the "emergency-aid exception" or the "community-caretaking exception." *State v. Dunn,* 131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 15. A warrantless police entry into a private residence is not unlawful if made upon exigent circumstances. *Mincey v. Arizona* , 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The need to

protect or preserve life or avoid serious injury is justification for what would otherwise be an illegal entry absent an exigent circumstance or emergency. *Id*.

{¶33} In *State v. Applegate*, 68 Ohio St.3d 348, 349, 626 N.E.2d 94 (1994), the Supreme Court of Ohio held that "[e]xigent circumstances justify a warrantless entry into a residence by police when police are at the residence pursuant to an emergency call reporting domestic violence and where the officers hear sounds coming from inside the residence which are indicative of violence." In support of that holding, the Ohio Supreme Court noted as follows:

> **A warrantless police entry into a private residence is not unlawful if made upon exigent circumstances, a "specifically established and well-delineated exceptio[n]" to the search warrant requirement. *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585. * * ***

> **"[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation of the judicial process." *Wayne*** [*v. United States* (C.A.D.C. 1963), 318 F.2d 205] **at 212.**

*Applegate, supra*, at 350.

{¶34} In the case before us, we find that there was certainly a reasonable basis for the officers to believe that someone in the apartment could be in peril and in need of immediate assistance. A finding of exigent circumstances here is supported by the information provided by the neighbor who called the police; the yelling, loud noises, and the specific threat of harm overheard by the responding

officers upon arrival; the known history of domestic violence calls at that residence; and Frisbie's evasive and uncooperative actions when he initially exited his apartment. Under the totality of those circumstances, the officers' decision to force entry into the apartment without a warrant was a reasonable and well-advised decision. We therefore find that the officers' warrantless entry into the apartment did not violate Frisbie's Fourth Amendment rights.

**{¶35}** Frisbie next argues that, even if the initial entry into his apartment was lawful, an unjustified and warrantless re-entry by police into the apartment then occurred. Frisbie claims that the re-entry was not justified after he had been detained and police had confirmed that no one else was in the apartment. We disagree, primarily because the record does not support Frisbie's claim that police made a second entry of the apartment.

**{¶36}** As we have already determined, the police officers were lawfully in Frisbie's apartment initially to do a welfare check for a potential domestic violence victim. Contrary to Frisbie's argument on appeal, the record reveals that the police never actually left Frisbie's apartment, as two policemen – Officers Walker and Traxler – remained in the apartment to watch Frisbie, who was still detained on the couch for that short period of time, while Officers Warnimont and Hackworth briefly stepped outside to confer with a supervisor. On those facts, we find that the "re-entry" of Warnimont and Hackworth into the apartment to issue a citation and

bond to Frisbie was a legitimate continuation of the initial investigation, particularly in light of Frisbie's noncompliant behavior when the police first approached the apartment. Put another way, the initial entry was no broader than necessary under the exigent circumstances existing at the time. It was then Frisbie's own actions that provided additional justification for the police officers temporarily detaining Frisbie, and then continuing to detain him while completing the paperwork necessary to charge him for his misconduct.

**{¶37}** Finally, Frisbie argues on appeal that the warrantless seizure of the two bags of drugs located behind the refrigerator was not justified under the plain view exception to the search warrant requirement.

**{¶38}** While law enforcement officers are permitted to make a warrantless search when they have a reasonable basis to believe that a victim is in need of aid, such a search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, an officer may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan v. Tyler*, 436 U.S. 499, 509–510, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

**{¶39}** The initial requirement for such a seizure pursuant to the "plain view" exception to the search warrant requirement is that "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly

-18-

viewed." *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In addition, the officer must be lawfully located in a place from which the object can be plainly seen, and must also have a lawful right of access to the object itself. *Id*. at 137. Finally, the incriminating character of the evidence in plain view must be "immediately apparent." *Id*. at 136.

{¶40} In this case, as we previously stated, Patrolmen Warnimont and Hackworth were justified in entering Frisbie's home to determine if a victim was in need of assistance. Contrary to Frisbie's suggestion on appeal, there is no indication in the record that the officers sought to conduct a warrantless search for drugs by using the "exigent circumstances" exception to the warrant requirement as a pretext of some sort. Rather, the record reflects that the officers forced entry into Frisbie's home for a limited purpose and their subsequent search of the apartment was limited to only what was necessary to effectuate the purpose of that entry, which was to find a victim who might need medical assistance or other aid.

{¶41} While the officers were lawfully still in the apartment and finishing up their initial investigation, including the issuance of the citation and bond paperwork to Frisbie, Patrolman Hackworth observed the two baggies full of suspected drugs behind the refrigerator, while he stood next to the refrigerator waiting for his partner to finish providing the bond information to Frisbie. We find, as the trial court did, that Officer Hackworth was lawfully located in a place from which the objects at

issue could be plainly seen, a place from which the officer had a right of access to the objects at issue, and that the incriminating character of the evidence in plain view was "immediately apparent."

{¶42} While Frisbie asserts on appeal that Patrolman Hackworth's claim of inadvertently noticing the drugs behind the refrigerator was not credible, the record more than adequately supports the trial court's finding of fact in that respect and, while corroboration is technically unnecessary, Hackworth's testimony about the placement of the refrigerator, the way the drugs behind it were situated, and how it was that the officer happened to notice the drugs in that location, was corroborated by multiple photographs introduced at the suppression hearings.

{¶43} Frisbie also asserts on appeal that the incriminating nature of the contents of the bags behind the refrigerator was not immediately apparent. We disagree. In assessing whether the incriminating nature of an item is immediately apparent for purposes of the plain view exception, a police officer need not know that the item in plain view is contraband or evidence of a crime; rather, it is sufficient that probable cause exists to associate the property with criminal activity. *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). See, also, *State v. Waddy*, 63 Ohio St.3d 424, 442, 588 N.E.2d 819 (1992). Probable cause is a common-sense standard, for which the police may use their special knowledge or experience to justify their belief that probable cause existed. *State v.*

*Willoughby*, 81 Ohio App.3d 562, 568-569, 611 N.E.2d 937 (1992), citing *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**{¶44}** In this case, Patrolmen Warnimont and Hackworth testified that, based on their training and experience, they recognized the substances in the two bags behind the refrigerator to be controlled substances. That testimony, as well as the manner in which the bags were being stored behind the refrigerator, adequately support a finding that the officers readily recognized and identified the items at issue as illegal drug evidence.

**{¶45}** In his merit brief, Frisbie also asserts in passing that the officers' moving of the refrigerator to retrieve the second bag of drugs was an additional, unlawful search. However, Frisbie cites no law in support of his claim that the plain view doctrine prohibits such action. While the law may prohibit manipulating or moving an object to initially determine if that object is contraband or evidence of a crime – see, *e.g.*, *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (2010) – we find no authority that prohibits moving an object in order to collect an item of contraband in plain view, assuming the officers, as here, are lawfully in a position to do so.

**{¶46}** Accordingly, for all of those reasons, we find that the trial court did not err in determining that the plain view exception to the general search warrant

requirement was applicable to the two bags of drugs observed behind the refrigerator and then seized by the police in this case without a warrant.

{¶47} Having found no error prejudicial to Frisbie in the particulars assigned and argued, the assignment of error is overruled and the judgments of the Hancock County Court of Common Pleas are affirmed.

*Judgments Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**